(Decided 21st June, 1887.)

THE PIEDMONT AND CUMBERLAND RAILWAY COMPANY *vs.* SAMUEL SPEELMAN. CHARLES F. MAYER, *et al. vs.* THE PIEDMONT AND CUMBERLAND RAILWAY COMPANY. CHARLES F. MAYER *vs.* SAME.

*Railroad company—Construction of Charter—Eminent domain—Act of 1876, ch. 242—Injunction—Practice in Court of Appeals—Remedy of Railroad by Amendment of its Charter, and not by Bill for Injunction.*

The general railroad law of the State—Act of 1876, ch. 242—provides that the certificate of incorporation of a railroad company, shall specify the name of the places of the *termini* of said road, and the county or counties, city or cities, through which it shall pass; and further provides that, whenever any railroad company shall find it

Piedmont & Cumberland Railway Co. *vs.* Speelman.

necessary, for reasonable causes, to change the location or grade of any portion of its road, it shall be authorized to make such changes of grade and location; not departing from the general route prescribed in the certificate of such company. The Piedmont and Cumberland Railway Company, was organized under this general law, and its charter certified that the corporation so formed was for the purpose of constructing and operating a railroad in Maryland, beginning at a point in Alleghany County, in said State, opposite the junction of the West Virginia, Central and Pittsburg Railway Company, with the Baltimore and Ohio Railroad Company, above Piedmont, in West Virginia; running thence through, or near to, the town of Westernport, in Alleghany County, Maryland, to a convenient point below Keyser, in West Virginia, where it may cross the north branch of the Potomac River into West Virginia, and also from a convenient point on the north branch of the Potomac, at or near the City of Cumberland, in Alleghany County, Maryland, to another convenient point adjacent thereto, all of the said road passing through Alleghany County, in the State of Maryland. HELD:

That the meaning of the charter of the Piedmont and Cumberland Railway Company, was that at a convenient point below Keyser, it should cross the Potomac into West Virginia, and run down on the West Virginia side of the river until near Cumberland, when it should recross into Maryland, and find its southern terminus near that city, and that its charter was valid, and the company had full power and authority to condemn a right of way over the Cookerly farm, in Alleghany County.

Where after an injunction had been obtained enjoining a railroad company from going on the land of which the complainant had a lease, the company not having agreed with him as to compensation, and not having condemned his interest in the land, he assigns his lease, and such fact is shown at the hearing of the case in the Court of Appeals, the order for the injunction will be reversed and the bill dismissed.

And where the assignment of this lease was obtained for the sole purpose of throwing obstacles in the way of the completion of the railroad, the assignee being the president of a rival road, a Court of equity will not, at the instance of such assignee, enjoin the railroad company from entering upon the leased premises to lay its railroad track over or through the same, but will leave the complainant to assert his rights, whatever they may be, in a Court of law.

Piedmont & Cumberland Railway Co. *vs.* Speelman.

Where the lessee of land through which a railroad company desired to have a right of way, refused to sell, and the railroad company attempted to condemn the interest of such lessee and failed to do so, the company is not entitled to an injunction to prevent a party, who, in the interest of a rival company, has obtained an assignment of the lease, and refuses to sell, from obstructing its entering on the land. If the railroad company supposed it had no right to condemn, and no agreement could be reached, its only remedy was by an amendment of its charter.

APPEALS from the Circuit Court for Alleghany County, in Equity.

The cases are stated in the opinion of the Court.

The first and second causes were argued before ALVEY, C. J., YELLOTT, STONE, MILLER, and BRYAN, J., and the third cause was argued before ALVEY, C. J., STONE, MILLER, ROBINSON, and BRYAN, J.

*William J. Read,* and *William Walsh,* for the Piedmont and Cumberland Railway Company.

Injunctions will not be granted in doubtful cases. The charges of an injunction bill must be direct and positive, and must be sufficient to show clearly and plainly the right claimed without the aid of presumptions. *Perkins vs. Collins,* 3 *N. J. Eq.,* 483; *Camden & A. R. R. Co. vs. Stewart,* 21 *N. J. Eq.,* 484 *at* 493; *Oliver vs. Palmer & Hamilton,* 11 *Gill & J.,* 426; *Butler vs. Rahm,* 46 *Md.,* 549; *Frostburg Buil. Asso. vs. Stark,* 47 *Md.,* 345; *Witthaus vs. Mattfelt & Co.,* 44 *Md.,* 306; *Worthington vs. Lee,* 61 *Md.,* 536; *Erie, Del. & L. R. Co. vs. R. R. Co.,* 21 *N. J. Eq.,* 283 *at* 291–4.

At best, whether Speelman has any interest or not, he has left it very doubtful on the statements of his bill; and if he has any it certainly is very small, and in such cases the Court never grants an injunction where its effect would necessarily be to arrest a public work and inflict

great damage and inconvenience upon the company making the public improvement. *Mayor, &c. of Balto. vs. Warren M'f'g Co.*, 59 *Md.*, 96, 105 ; *Connolly & McCarthy vs. Riley*, 25 *Md.*, 402 ; *Lanterman vs. Blairstown R. R. Co.*, 28 *N. J. Eq.*, 1 ; *Higbee & Riggs vs. Camden A. & T. Co.*, 20 *N. J. Eq.*, 435 ; *Hackensack Improvement Commission vs. N. J. Mid. R. Co.*, 22 *N. J. Eq.*, 94 ; *Stevens vs. Patterson, &c. R. R. Co.*, 20 *N. J. Eq.*, 126 ; *Kerr on Injunctions*, 225–6 ; *Williamson vs. Carman*, 1 *Gill & J.*, 184 ; *Pickert vs. Ridgefield Park R. Co.*, 25 *N. J. Eq.*, 316 ; *Wood vs. Charing Cross R. Co.*, 33 *Beav.*, 290 ; *Langford vs. Brighton R. Co.*, 4 *R'y & Canal Cases*, 69 ; *Webster vs. South Eastern R. Co.*, 1 *Sim. N. S.*, 272 ; *Carnochan vs. Norwich & L. R. Co.*, 26 *Beav.*, 169.

As there is no sufficient ground for granting the injunction on the merits, the bill should be dismissed. *Webster vs. County Comm's of Baltimore County*, 51 *Md.*, 395 ; *Kelly, et al. vs. Mayor, &c. of Balto.*, 53 *Md.*, 134.

Where the description of route is general, a large discretion is allowed to the company in selecting its location, and its charter will be liberally construed to enable it to select a practicable route, and thereby more effectively accomplish the public purposes of its incorporation. *N. Docks R. R. Co., vs. Central R. Co.*, 32 *N. J. Eq.; Att'y-Gen'l vs. Delaware and Roundbrook R. Co.*, 27 *N. J. Eq.*, 631, 643 ; *Long Branch Com'rs vs. West End R. R.*, 29 *N. J. Eq.*, 567 ; *Central R. R. Co. vs. Penn. R. Co.*, 31 *N. J. Eq.*, 475, 486 ; *Morris & Essex R. R. vs. Central R. R. Co.*, 31 *N. J. Law*, 205, 211 ; *State vs. Hulick*, 33 *N. J. Law*, 307, 308, 309 ; *People vs. Brooklyn R. R. Co.*, 89 *N. Y.*, 75, 87, 88 ; *Mohawk Bridge Co. vs. Utica & L. R. R. Co.*, 6 *Paige*, 554 ; *Union Pacific R. Co. vs. Hall, et al.*, 91 *U. S.*, 343 ; *Chicago, B. & Q. R. R. Co. vs. Chamberlain*, 84 *Ill.*, 333 ; *Cleveland & P. R. R. Co. vs. Speer*, 56 *Penn.*, 325 ; *Parke's Appeal*, 64 *Penn.*, 137, 140, 141 ; *Pa. R. R. Co. vs. Consol. Co il Co., and C. & P. R.*

*R. Co.*, 55 *Md.*, 158; 2 *Wood on Railroads, sec.* 267, *page* 953; 1 *Morawetz Corp., secs.* 320, 369.

Unless the company has clearly exceeded the limits of this discretion, showing bad faith, the Court will not disturb its location. *Fall River Iron Works vs. Old Col. & F. R. R. Co.*, 5 *Allen*, 221, 226.

Even if the locality in question should be considered, by fair and just construction, outside of the limits of discretion in locating the main line, as described in the certificate, it would be clearly, we think, embraced by the right of alteration of route allowed under the eleventh section of the General Railroad Law, which must be read and taken as a part of our charter. 1 *Morawetz on Corp., secs.* 372, 373; *Re N. Y. & L. W. Co.*, 88 *N. Y.*, 279.

The location in question is also clearly authorized, in our judgment, under the branching powers given by the fourth section of said General Railroad Law. These branching powers have always been very liberally construed, to enable the particular corporation to accomplish, in the fullest manner, the public purposes for which it was organized, and bring its benefits to various localities in its general neighborhood. 2 *Wood Railway Law, sec.* 238, *page* 755; 1 *Wood R'y Law, sec.* 170, *pages* 479 *and* 480, *sec.* 190, *pages* 543–4; *Mayor vs. Pa. R. R. Co.*, 48 *Penn.*, 355; *Western P. R. R. Co's Appeal*, 99 *Penn.*, 155; *McAboy's Appeal*, 107 *Penn.*, 548; *Vollmer's Appeal*, 6 *Central Rep.*, 599; *Howard County vs. Central National Bank of Booneville*, 108 *U. S.*, 314; *Att'y-Gen'l vs. Del. & B. B. R. R. Co.*, 27 *N. J. Eq.*, 631, 644; *Att'y-Gen'l vs. West W. R. R. Co.*, 36 *Wis.*, 488; *Mayor, &c. vs. B. & O. R. R. Co.*, 21 *Md.*, 51, 66, 91; 1 *Morawetz Corp., sec.* 373; *C. & N. R. R. Co. vs. C. & E. R. R. Co.*, 112 *Ill.*, 589.

The Piedmont and Cumberland Railway Company might build a continuous line, or not, as suited its convenience, so the public benefits from the operation of the line were the same. 1 *Morawetz on Corp., sec.* 372; *Peo-*

*ple vs. Holden*, 82 *Ill.*, 93; *Black vs. Del. & Rar. Canal Co.*, 22 *N. J. Eq.*, 130, 402; *Kenicott vs. Supervisors of Wayne County*, 16 *Wall.*, 452.

But even if the railroad under its certificate, or power of alteration of route, or power of branching, is not authorized to condemn land in the locality and operate its railroad thereon under its corporate franchises, it nevertheless violated no law in purchasing a right of way there and building a railroad thereon. It has the same right, except as against the State, to purchase and hold land and apply it to a roadway, as a natural person; and a natural person may build a railroad wherever he can secure the land for the purpose; and may operate it as such, but his liability to adjacent owners for injuries resulting, and his restrictions as to charges, might be different from those of a corporation with railroad franchises. *Pierce on Railroads*, 2; *Angell & Ames Corp.*, sec. 153; 1 *Wood on Railroads*, sec. 2; *Bissell vs. M. & S. R. R. Co.*, 22 *N. Y.*, 258; *Farmers' and M. Bank vs. D. & M. R. R. Co.*, 17 *Wis.*, 372; *Whitman Gold and Silver Mining Co. vs. Baker*, 3 *Nev.*, 386; *Rutland & B. R. R. Co. vs. Proctor*, 29 *Vt.*, 93; *Coe vs. N. J. Mid. R. R. Co.*, 31 *N. J. Eq.*, 145; *Cassidy vs. Old Colony Railroad*, 141 *Mass.*, 174.

But still farther if the railway company was organized as a corporation under laws of another State, and derived no power at all, as a corporation, from the laws of this State, it would nevertheless be authorized, on principles of law accepted everywhere, to acquire and use lands, or other property in this State. It is no crime against our laws to acquire and use such property. No law prohibits such purchase and use; and property so purchased and held is not outside of the protection of the law of the State and exposed to the injury of any evil minded person who may choose to trespass upon it. 2 *Morawetz on Corp.*, sec. 961; *Cowell vs. Colorado Springs Co.*, 100 *U. S.*, 55; *American and Foreign Christian Union vs. Yount*, 101 *U. S.*, 353; *Pierce on Railroads*, 14.

It is quite usual for railroads incorporated in one State to go into a sister State and acquire property and do business there without express legislative authority from the sister State; unless prohibited by the laws of the latter State. *Dike vs. Erie R. Co.*, 45 *N. Y.*, 113; *Ellsworth vs. St. Louis, &c. R. Co.*, 98 *N. Y.*, 553; *Re Townsend*, 39 *N. Y.*, 171; *Mead vs. New York, H. & N. R. R. Co.*, 45 *Conn.*, 199.

There can be no doubt that Mayer knew, and was bound to know, the rights of the Railway Company in the property and the extent of its works and expenditures thereon, and that Speelman's claim was denied and contested. He took the land *cum onere*. No one can object to a location of a railroad on his property, whose title does not go back to the time the land was occupied and the location made by the company. *Hentz vs. Long Island R. R. Co.*, 13 *Barb.*, 646; *Waterbury vs. Dry Dock Co.*, 54 *Barb.*, 388; *McLendon vs. The West Point and Atlanta R. R. Co.*, 54 *Ga.*, 293; *Morris & Essex R. R. vs. Blair*, 9 *N. J. Eq.*, 635, *Lawrence's App.*, 78 *Pa. St.*, 365; *New Brighton & N. C. R. R. Co's Appeal*, 105 *Pa. St.*, 13; *Davis vs. Titusville, &c. R. R. Co.*, 5 *Cent. Rep.*, 903; *Short vs. Rochester & P. R. R. Co.*, 6 *Cent. Rep.*, 627; *Canal Co. vs. B. & O. R. R. Co.*, 4 *G. & J.*, 1; *C. & P., and B. & O. R. R. Co. vs. Pa. R. R. in Md.*, 57 *Md.*, 267; *Chicago & E. I. R. R. Co. vs. Loeb*, 5 *Western Rep.*, 887; *Same vs. McAuley*, 8 *Western Rep.*, 457; *Balto. & O. R. R. Co. vs. Straus, et al.*, 37 *Md.*, 237.

The transfer of the Speelman claim to Mr. Mayer under the circumstances stated, and for the purpose of obstructing and hindering the completion of the Railroad's work, was unlawful, contrary to public policy and to the spirit of the laws of civilized communities, and conferred no rights upon him which Courts of equity organized by such communities can recognize or sanction.

The well-being of the community requires competition. Mr. Mayer makes a bold attempt to destroy it. 1 *Wood*

*on Railroads, sec.* 175; *Rens. and San. R. R. vs. Davis,* 43 *N. Y.,* 137; *Colles vs. Trow City Directory Co.,* 11 *Hun,* 397; *State vs. Hartford & N. H. R. R. Co.,* 29 *Conn.,* 539; *Elkins vs. Cam. & A. R. R. Co.,* 36 *N. J. Eq.,* 5; *Morgan vs. Donovan,* 58 *Ala.,* 241; *Cin. & C. R. R. vs. Danville, &c. R. Co.,* 75 *Ill.,* 113; *Waldo vs. Chicago, &c. R. R. Co.,* 14 *Wis.,* 575; *The Wiggins Ferry Company vs. Chicago and Alton Railroad Co.,* 73 *Mo.,* 389; *Pacific R. R. vs. Seely,* 45 *Mo.,* 212; *Wiggins Ferry Co. vs. A. R. R. Co.,* 5 *Mo. App.,* 347; *Lynn vs. Mount Savage Iron Co., et al.,* 34 *Md.,* 603.

If the Piedmont and Cumberland Railway Company were condemning rights of the Cumberland and Pennsylvania Railroad Company, it could not be allowed damages for diminishing or incommoding its business; much less can it, or its president for it, be allowed to reach out and acquire property selected, bought and improved by the Piedmont Railway Company for its roadway, in order to prevent competition or save its business, or secure any irregular and collateral advantage. *Boston and Worcester Railroad Corporation vs. Old Colony Railroad Corporation,* 12 *Cush.,* 605; *Troy and Boston R. R. Co. vs. Northern Turnpike Co.,* 16 *Barb.,* 100.

The assignment of the alleged lease from Speelman shows that the interest of said Speelman therein was assigned to Charles F. Mayer, President of the Cumberland and Pennsylvania Railroad Company. Neither said Mayer nor said company had any right, which can be recognized in a Court of equity, to acquire the strip of land covered by the Piedmont Company's right of way, in its possession and graded ready for the rails months before such transfer to the knowledge of Mr. Mayer and his company.

One rival company, or any individual in its interest, cannot be allowed to deprive the public of the benefit of competition by hindering the construction, or destroying the work of another similar corporation. Valid claim to

land can be acquired for no such purpose. Mr. Mayer and his company are outside of their powers in attempting what this Court cannot sanction. *Wood's Railway Law,* sec. 176, *page* 518; *Rensselaer & S. R. R. Co. vs. Davis,* 43 *N. Y.,* 137 ; *Morgan vs. Donavan,* 58 *Ala.,* 241 ; *Elkins vs. Camden & A. R. Co.,* 36 *N. J. Eq.,* 5 ; *Canal Co. vs. Railroad Co.,* 4 *G. & J.,* 1 ; *Cin. & C. R. R. Co. vs. Danville, &c. R. Co.,* 75 *Ill.,* 113..

The company first locating its lines has prior right. *Morris & Essex R. R. Co. vs. Blair,* 9 *N. Y. Eq.,* 635 ; *Waterbury vs. Dry Dock, &c. R. R. Co.,* 54 *Barb.,* 388 ; *Canal Company vs. Railroad Company,* 4 *G. & J.,* 1.

Even if Mr. Mayer was a *bona fide* transferree of the disputed claim of Speelman, and if that interest extended to February next, it is of so fugitive a character and so insignificant in value—as to the strip covered by the right of way—and the damage and inconvenience to the Piedmont Railway Company and the public would be so great and incalculable, if an injunction was granted, that the Court will not disturb the Railway Company in the possession and use of the property which Mr. Mayer procured, and which, even according to this bill, so deficient in candor, he knew long before the transfer to him, the Piedmont Company had located its railroad upon and was endeavoring to perfect its title thereto. *Carnochan vs. Norwich & L. R. R. Co.,* 26 *Beav.,* 169 ; *Wood vs. Charing Cross R. Co.,* 33 *Beav.,* 290 ; *Parks vs. Great Wycom R. R. Co.,* 8 *Jurist, N. S.,* 251 ; *Langford vs. Brighton & C. R. Co.,* 4 *Railway & C. Cases,* 69 ; *Webster vs. South Eastern R. R. Co.,* 1 *Sim. N. S.,* 272 ; *Deere vs. Guest,* 1 *Myln. & Craig,* 516 ; 66 *Penn.,* 404 ; 78 *N. Y.,* 423 ; *Troy & B. R. R. Co. vs. Boston, H. T. & W. R. R. Co.,* 86 *N. Y.,* 107 ; *Erie R. Co. vs. Delaware R. R. Co.,* 21 *N. J. Eq.,* 283 ; *Hackensack Improvement Commission vs. N. J. Mid. R. R. Co.,* 22 *N. J. Eq.,* 94 ; *Pickert vs. Ridgefield Park R. R. Co.,* 25 *N. J. Eq.,* 317 ; *Lanter-*

*man vs. Blairstown R. R. Co.*, 28 *N. J. Eq.*, 1; *Remshart vs. The Savannah and Charleston R Co.*, 54 *Georgia*, 579; *Griffin vs. Augusta and Knoxville Railroad*, 70 *Georgia*, 164; *Vanderpool, et·al. vs. La Crosse and Milwaukee R. R. Co.*, 44 *Wis.*, 653; *Mann vs. Railroad Company*, 55 *Ver.*, 488; *High on Injunctions, sec.* 387.

*W. Irvine Cross*, and *William F. Frick*, for Speelman, Mayer and others.

STONE, J., delivered the opinion of the Court.

There are three cases on the special docket of this term that are all parts of one transaction, and are so inseparably connected together, that one opinion will dispose of the whole of them. The facts of these several cases are so interwoven, that one cannot be properly considered by itself, but justice requires them to be considered together.

The history of this litigation can be very briefly stated. The Piedmont and Cumberland Railway Company was organized under the general railroad law of this State, for the purpose of constructing a railway in Alleghany County, beginning at a point above Westernport, and running down to Cumberland. The corporation began the work of constructing the road, and continued, perhaps more than half their projected line, until they came to a small farm in Maryland called the Cookerly farm, and at that point their difficulties began. It seems that they agreed with the owners in fee of this farm as to the right of way, but as some of these were minors it was concluded to condemn it, and an inquisition was duly held and ratified by the Court. A man by the name of Speelman, however, claimed to be a tenant on this farm, and to hold it under a lease for two years. When the Piedmont and Cumberland Railway Company undertook to condemn the right of way through the Cookerly farm, it made this man Speelman a party to the proceedings, and

the jury valued his interest at $200. When the finding was returned to Court, Speelman objected to the confirmation of the inquisition upon the ground that the railway company had no power under its charter to condemn the land, and the Court did set aside the inquisition as to Speelman, but confirmed it as to the Cookerlys, and the judgment seems to have been paid them.

It should be stated that before these condemnation proceedings were begun, which was on 1st of October, 1886, Speelman, to wit, on the 8th of September, 1886, had obtained an injunction against the company, prohibiting it from going on the land. The ground upon which he obtained the injunction was, that he had a lease on the farm, and the company had not agreed with him as to compensation, and had not condemned his interest.

The company allege, and probably with truth, that at the time it agreed with the Cookerlys, they had no knowledge of the claim of Speelman. At any rate, immediately after the injuction was obtained by Speelman, the company commenced the condemnation proceedings, which resulted, as we have seen, in setting aside the inquisition as to Speelman, probably upon the ground that the charter of the company did not authorize the condemnation at that point. From this decision of the Circuit Court in setting aside this inquisition as to Speelman, all the subsequent litigation in these cases has sprung. Immediately after that decision, a rival and hostile corporation, the Cumberland and Pennsylvania road, by its president, Mr. Mayer, appears upon the scene, and having purchased the right of Speelman to this land, has exhausted every legal expedient to hinder and delay the building of the road.

As, however, the important question in the case is the validity of the charter of the Piedmont and Cumberland road, we will first consider that.

That company was organized under the general railroad law of the State. That law provides that the certificate of incorporation shall specify:

"First, the name assumed by such company, and by which it shall be known ; second, the name of the places of the *termini* of said road, and the county or counties, city or cities through which such road shall pass; third, the amount of capital stock necessary to construct such road." A subsequent section provides:

"That whenever any railroad company heretofore incorporated, or which may hereafter be incorporated, shall find it necessary for the purpose of avoiding annoyance to public travel, or dangerous or difficult curves or grades, or unsafe or unsubstantial grounds or foundations, or for other reasonable causes to change *the location* or grade of any portion of their road, whether heretofore made, or hereafter to be made, such railroad companies shall be, and are hereby authorized to make such changes of grade and location, not departing *from the general route* prescribed in the certificate of such company."

The point of the objection to the charter is that the railroad does not pursue the route laid down in its charter. The charter on that point is in these words:

2. We do further certify, that the said corporation so formed is a corporation for the purpose of constructing and operating a railroad in Maryland, beginning at a point in Alleghany County, in said State, opposite to the junction of the West Virginia Central and Pittsburg Railway Company with the Baltimore and Ohio Railroad Company, above Piedmont, in West Virginia ; running thence through or near to the town of Westernport, in Alleghany County, Maryland, to a convenient point below Keyser, in West Virginia, where it may cross the North Branch of the Potomac River into West Virginia, and also from a convenient point on the North Branch of the Potomac, at or near the city of Cumberland, in Alleghany County, Maryland, to another convenient point adjacent thereto—all of the said road passing through Alleghany County, in the State of Maryland.

There is no pretence that the *termini* of the road are not designated in its charter with reasonable certainty. It is to run from a point in Alleghany County, opposite the junction of the West Virginia Central and Pittsburg Railway Company, with the Baltimore and Ohio Railroad Company, to a convenient point adjacent· to Cumberland. Nor is there any difficulty as to the "cities." The charter only calls for one town, Westernport, and that the road now runs to.

But the charter says that at a convenient point below Keyser, the road may cross the Potomac into West Virginia, and also from a convenient point on the Potomac, at or near the City of Cumberland to another point adjacent thereto.

The meaning of this latter clause undoubtedly is, that the road was expected to be built from the place where it first crossed the Potomac into West Virginia, on the West Virginia side of the river, until it recrossed into Maryland, near Cumberland. If the road had been so built or attempted to be, would it have been a valid charter, and could the land adjacent to Cumberland been properly condemned ? for we must all concede that if a railroad organized under the general law attempts to condemn property outside of its legal route, the inquisition will be enjoined.

The general railroad law of this State is a remedial statute, and is therefore to be construed liberally. Good faith and reasonable certainty is all that is required. In passing that law, the Legislature distinctly recognized the benefit of railroads to the community, and did away with the old cumbersome and expensive mode of obtaining by legislative action, the right to build them. It was the manifest object of that law to enlarge and not to restrict the construction of railroads.

The general railroad law, (Act of 1876, ch. 242,) stands in the place of, and is a substitute for the old special char-

ter, and if the route laid down in the certificate of the Piedmont and Cumberland road, would have been sufficiently certain in a special charter, we apprehend that it will be sufficient in this charter.

The meaning of the charter of the Piedmont and Cumberland road, was that at a convenient point below Keyser, it should cross the Potomac into West Virginia, and run down on the West Virginia side of the river until near Cumberland, when it should recross into Maryland and find its southern terminu near that city.

Now we cannot perceive why that is not a perfectly valid charter. The fact that the road runs through two States does not make it two roads. The Baltimore and Ohio runs from Maryland into West Virginia and back again into Maryland without losing its identity as one road, or any difficulty being perceived in its special charter giving it that privilege. If there is no objection in giving such privilege by special charter, where is the objection to such charter under the general law? The case of *Re New York, Lackawanna and Western Railroad Co.*, 88 *N. Y.*, 279, is, we think, a case in point. In that case, after the incorporation under the general railroad law of New York, which is in that respect like ours, the directors came to the conclusion that *a part* of the road should be run through the State of Pennsylvania, and this route necessitated a change of *a county* in New York, through which the road was to run. They took steps to do this by amending their charter, but the Court of Appeals of that State decided that it was unnecessary to amend, as they had power under their certificate to make the change. No question whatever was made of the power of a road in order to straighten its line, or for any other proper cause, to run into an adjoining State and return. Of course the State of Maryland has nothing to do with the road in West Virginia, but she can permit by either general or special law the road to run beyond her limits and return.

No possible reason can exist why, under the general law, a railroad lying on the border of a State may not be built partly in one State and partly in another. The conformation of the country may make it a necessity to do so, or the public interest, which, as Mr. Wood says, is the interest of the stockholders, may make it desirable to do so. For these reasons we think that a road lying near the border line between two States, may lie partly in one and partly in the other. The law of this State requires the *termini* to be fixed in this State, with reasonable certainty, and the cities (if any) through or near which the road is to pass. We think the *termini* have been fixed in this charter, good faith has been observed, and the towns have been named.

But another objection is raised against the charter, and that is, that after crossing into West Virginia, at a convenient point below Keyser, it recrossed into Maryland *before* it reached the point near Cumberland.

The charter, as we construe it, only gives the road *permission* to go to West Virginia, but it certainly does not *compel* it to go to West Virginia and stay there until near Cumberland. In the nature of things a Maryland law could not *compel* a corporation to go out of the State, all it could do is to give it permission to do so.

But that question seems to us to be disposed of by the twelfth section of the Act of 1876, that provides that for any reasonable cause he road *may make* a change in its location, provided it does not depart from the general route prescribed by its charter. An inspection of the map will show that this road has not departed from the general route prescribed by the charter. Its general route by its charter (on that part) is from below Keyser to Cumberland, and it has pursued that route in a line straighter and more direct than the boundary line (the Potomac) between the two States. The crossing and recrossing the river was evidently only to avoid natural obstacles, difficult to surmount, and made the line more direct.

We are of the opinion that the Piedmont and Cumberland Railroad have full power under their charter, to locate and build the road where they have located it, and as a necessary consequence the full power and authority to condemn a right of way over the Cookerly farm.

This main question being settled, the several cases may be disposed of without much difficulty,—and first as to the case of Speelman.

He, having alleged in his bill that he had an interest as tenant, and which, *prima facie*, we think he had, and that he had not been paid by the railroad, nor his interest condemned, he was entitled to an injunction until by one or the other of these modes, the railroad had acquired the right to go on the land.

But inasmuch as it is clearly shown that at the time of the trial of this case in the Court of Appeals, he had parted with his interest and had no longer any interest in the subject-matter of the suit, the order for the injunction must now be reversed and the bill dismissed.

But Mayer, his assignee, filed a bill subsequently on 30th March, 1887, alleging, among other matters, the same thing that Speelman had, that is, that his interest had not been paid for or condemned, and asking an injunction which was refused.

Under ordinary circumstances Mayer would have been entitled to an injunction to restrain the entry of the road upon the leased premises, until either by agreement or condemnation he was paid for his interest.

But the several records now before the Court disclose beyond a reasonable doubt that the purchase of Mayer of this lease was for the *sole* purpose of throwing obstacles in the way of the completion of the road ; and that the purchase of the lease was made in the interest of a rival road, of which he was president, and after he believed that the charter of the Piedmont and Cumberland road did not authorize a condemnation there.

Whatever may be the mere legal rights of the complainant he must assert them in the Courts of law, as a Court of equity will not lend its aid to further so discreditable a scheme, and the order refusing the injunction will be affirmed. *Wood vs. Charing Cross R. R. Co.*, 33 *Beav.*, 291.

The third and last case, is the case of *Mayer and others vs. the Railroad,* in which an injunction was granted the road against Mayer and others. This injunction was granted in Feb., 1887, and after the road had attempted to condemn the interest of Speelman and had failed to do so. It is also apparent that no agreement had been made with Mayer, the assignee. The case as it then appeared, was this: The owner of the lease would not sell, and the road supposed it could not condemn the interest. By making Speelman a party to the inquisition they acknowledged that he had a claim of which they had notice.

But we fail to see how these facts authorized a resort to a bill for an injunction. If no agreement could be reached, and the road supposed it had no right to condemn, an amendment of their charter was the only remedy, and not a resort to an injunction, and that case must be reversed and the bill dismissed.

We do not think it necessary to notice many points raised in the argument. The view we have taken disposes of the whole of these cases.

> *Order reversed with costs, and bill dismissed in the case of The Piedmont and Cumberland Railway Co. vs. Speelman. Order reversed with costs, and bill dismissed in Mayer, et al. vs. Piedmont and Cumberland Railway Co. Order affirmed with costs in Mayer vs. Same.*

(Decided 21st June, 1887.)

ALVEY, C. J., filed the following opinion, in which MIL-LER, J., concurred:

I entirely concur in the result of the opinion, whereby these cases have all been dismissed, as being without equity to support them. But I do not agree in that portion of the opinion which treats of the construction of the Act of 1876, ch. 242, and the certificate of incorporation of the Piedmont and Cumberland Railway Company, granted under that Act. I shall, therefore, state briefly my views of these cases, and of the rights and powers of the Piedmont and Cumberland Railway Company, derived through its certificate of incorporation, under the Act of 1876.

There are three cases, and three several appeals, all brought here from orders of the Court below, passed upon mere *ex parte* presentations by the complainants, by their several bills. All the bills relate to the same subject-matter of contest, and in each bill an injunction is prayed. While the cases were not in fact all argued together, as they well might have been, they were all argued by the same counsel, representing the same opposing pretensions in each case; and all three cases, therefore, may well be considered and disposed of together, in one opinion.

The first case in the series is that of Speelman, the alleged tenant, against the Piedmont and Cumberland Railway Company, in which the latter is sought to be restrained from entering upon and constructing its road over the land held by the complainant, as tenant, his interest in such land, embraced within the location of the roadway, not having been purchased or condemned by the defendant. The bill was filed on the 8th of Sept., 1886, and an *ex parte* order for an injunction was obtained the same day. After the injunction was issued, the defendant, by taking an appeal and giving bond, dissolved the injunction, and proceeded with its work on the road.

The allegations of the bill furnish sufficient ground for an injunction; and if this bill stood alone, without regard

to subsequent disclosures as to the changed relations of the complainant to the subject-matter of contest, the order appealed from would have to be affirmed, and the injunction restored. *B. & O. R. R. Co. vs. Thompson,* 10 *Md.,* 76; *New Central Coal Co. vs. George's Creek Coal and Iron. Co.,* 37 *Md.,* 539, 566. But, by the bill subsequently filed by Charles F. Mayer, as assignee, against the Piedmont. and Cumberland Railway Company, founded upon the same alleged right of Speelman, the tenant, alleging the utter absence of power in the defendant to acquire the proposed right of way for its road, and praying the same relief as that prayed in the previous bill of Speelman, it is shown that Speelman, on the 10th of January, 1887, assigned all his right, title and estate, in and to the leasehold premises, to Charles F. Mayer, president of the Cumberland and Pennsylvania Railroad Company. The Piedmont and Cumberland Railroad, when completed, will be a rival and competing road with that of the Cumberland and Pennsylvania Railroad; and the company owning this last mentioned road has many interests that will be in conflict. with the successful operation of the road of the defendant. when completed. In view of the circumstances disclosed,. it is not a matter of doubtful conjecture as to the motive and object of obtaining the assignment of the lease from. Speelman to Mayer. Indeed, that object is not attempted to be concealed.

It thus appears that Speelman has no longer any interest in the subject-matter of the contest, and is therefore not entitled to have the injunction granted on his bill restored by an affirmance of the order appealed from. Nor is Mayer entitled to an injunction on his bill; for it is conceded that he knew of the purpose, and of the steps taken by the defendant company, to procure the right of way for its road over the leased premises, and that he had no other motive or purpose in obtaining the assignment of the lease from the tenant than that of obstructing and, if possible,

Piedmont & Cumberland Railway Co. *vs.* Speelman.

totally defeating the construction of the defendant's road over the land embraced in the lease. This being the fact, whatever might be the determination of a Court of law in respect to it, it is very certain that a Court of equity will lend no aid to give effect to such a transaction. In the view of that Court such a contract, entered into for such a purpose, is not only against conscience, but against public policy, and will not be enforced or allowed effect as against the party or company sought to be prejudicially affected. It has been held upon full consideration, that a railroad company has no right to purchase land, merely to prevent a rival company from obtaining it, or for purposes of obstruction or speculation; nor could it be purchased in the name of an officer of the company for the latter's benefit, for any such purpose. *Rensselaer, &c. R. Co. vs. Davis,* 43 *N. Y.,* 137; 1 *Moraw. Corp.,* sec. 394, and cases there cited. It is not claimed or pretended that Mr. Mayer would have had anything to do with the lease but for the fact of his relation to the rival road, owned by the Cumberland and Pennsylvania Railroad Company; and that the assignment of the lease was obtained in the interest and behalf of that company, is clearly shown upon the face of the assignment itself, for it is made in terms to Mayer as president of the Cumberland and Pennsylvania Railroad Company. There is no room to doubt that the assignment was obtained solely for purposes of obstruction, and to furnish the foundation for litigation with the rival company, whereby advantages might be obtained by delay, and from such embarrassment to that company as would likely result from persistent and protracted litigation in regard to its right of way. To accomplish such purpose a Court of equity will not for a moment lend its aid, or give to the attempt the slightest countenance. *Ffooks vs. Lon. & S. W. R. Co.,* 1 *Sm. & Giff.,* 142; *Hart. & N. Haven R. Co. vs. N. Y. & N. H. R. Co.,* 3 *Rob.,* 411. The Court below was therefore clearly

right in refusing the injunction prayed by the bill filed by Mayer against the Piedmont and Cumberland Railway Company.

But while neither Speelman nor Mayer has any equitable grounds for calling into active exercise the powers of a Court of equity, on the bills filed by them, as the facts are now disclosed, the Piedmont and Cumberland Railway Company is equally without right to invoke the assistance of the Court on its bill, filed against Mayer and others. Mayer and his men were in possession of the premises, claiming under Speelman. To entitle the railroad company to aid from the Court, it was incumbent upon it to show clearly a superior right to that of Speelman, or any one claiming under him. This it has wholly failed to do. That Speelman had an interest in the farm, is shown by the lease exhibited, and the accompanying possession under it; and his right or interest was fully conceded by the railroad company, in the proceedings taken to condemn his interest in the location of the road through the farm. The condemnation proceeding failed, because of the decision of the Circuit Court that there was no power in the railroad company, under its certificate of incorporation, to take such proceeding to acquire a right of way in that location, *in invitum*. That decision was a *finality* as to the rights involved in that case, and there could be no review of it; and especially not by a Court of equity,—that Court having no power to *reverse* the judgment of the Circuit Court rendered in a condemnation proceeding under the statute.

It is clear, then, that there was no sufficient ground shown in the bill filed by the railroad company for an injunction; and there was, therefore, error committed by the Court below in the order passed thereon granting the injunction. And this bill, as well as the other two bills, has been properly dismissed by the opinion of this Court. To this extent we all agree, as I understand the opinion; and thus all the cases are fully disposed of, without anything more necessary to be said in regard to them.

But the majority of the Court, in the opinion filed, have deemed it proper to go further, and to declare their construction of the certificate of incorporation of the railroad company, in connection with the provisions of the statute under which the certificate was granted, as to the right of the company to make location of its road. It is to this part of the opinion that I do not assent.

By the certificate of incorporation, a railroad company, by the name of "The Piedmont and Cumberland Railway Company," was incorporated in April, 1886; and there was another company of the same name incorporated under the law of West Virginia, for the construction of a railroad from Piedmont to Cumberland. The town of Piedmont, in West Virginia, and the City of Cumberland, in Maryland, are both on the north branch of the Potomac river, and are some twenty odd miles apart by the course of the river. By the certificate of incorporation, under the general railroad incorporation law of this State, it is declared that the corporation formed is "for the purpose of constructing and operating a railroad in Maryland, beginning at a point in Alleghany County, in said State, opposite the junction, &c., above Piedmont, in West Virginia, and running thence through or near to the town of Westernport, in Alleghany County, Maryland, *to a convenient point below* Keyser, in West Virginia, where it may cross the north branch of the Potomac River *into* West Virginia ; and also *from* a convenient point on the north branch of the Potomac, *at or near* the City of Cumberland, in Alleghany County, Maryland, to another convenient point adjacent thereto—all of the said road passing through Alleghany County, in the State of Maryland." The road has been, for much the greater part of the way, actually constructed. By an illustrative map, used in the argument, it is shown that from the western terminus, to the convenient point below Keyser, the route prescribed in the certificate of incorporation has been pur-

sued, in the location and construction of the road; and at the latter point it has been taken across the river into West Virginia, to connect and run with the road of "The Piedmont and Cumberland Railway Company," in that State. In the bill filed by the railroad company it is expressly admitted and averred that the two roads, the one a Maryland and the other a West Virginia road, *were intended to form a continuous line* from the commencement above Piedmont to the City of Cumberland. The road crosses and re-crosses the river several times; but, as will be observed, there is no route prescribed in the certificate for the road on the Maryland side of the river, from the point where the road first crosses to the West Virginia side below Keyser, to the point on the river at or near Cumberland; and the road approaches this latter point for several miles on the We t Virginia side of the river, and from which it crosses the river to enter Cumberland. The Cookerly farm, the *locus in quo*, is some two or three miles below the point where the road first crosses the river below Keyser, and some thirteen or fourteen miles above Cumberland. Looking to the route as prescribed in the certificate of incorporation, and to the subsequent manner of location and construction of the road, it is too clear for question that it was no part of the plan of the road, when the certificate of incorporation was executed, that any portion of the line should be located in Maryland after it crossed the river below Keyser, until it reached the point at or near Cumberland, by the route on the West Virginia side of the river. And if such was the intention of the corporators at the time of the execution of the certificate, and that is made manifest by the certificate itself, it is certainly clear that no mere subsequent change of purpose could confer upon them the right to adopt a different route. The statement in the certificate that all of said road passes through Alleghany County, means, of course, that so much of the route as is prescribed in the

certificate passes through that county, which is strictly the fact.

It is fully conceded by all, as I understand the position taken, that it was the original intention of the corporators to connect their road below Keyser with the road of the same name on the West Virginia side of the river, and to make a continuous line by the use of that road or route down to a point opposite to Cumberland, where it would re-cross the river and come into the city. Indeed, all the facts of the case, as well as the route described in the certificate of incorporation, plainly show such to have been the intention.

But it is supposed that the difficulty, growing out of the fact of the change of route from that originally contemplated by the corporators at the time of the execution of the certificate of incorporation, and as described therein, may be obviated by force of the provisions contained in sect. 12, of the Act of 1876, ch. 242. I have not, however, been able so to read that section of the statute.

It is in that section provided, that whenever any railroad company shall find it necessary for the purpose of avoiding annoyance to public travel, or dangerous or difficult curves or grades, or unsafe or unsubstantial ground or foundations, or for other reasonable causes, to change the location or grade of any portion of its *road*, whether heretofore made, or hereafter to be made, such railroad company shall be authorized to make such changes of grade and location, *"not departing from the general route prescribed in the certificate of such company."* It thus appears to be necessary, by the plain terms of the statute, that the general route of the intended road shall be prescribed in the certificate of incorporation; and the route so prescribed, cannot be departed from, except in the manner and to the extent as provided for in this 12th section of the Act. This provision of the statute, as the terms plainly import, applies only to an existing road,

and not to one to be constructed and before construction. The railroad company, however, has made no pretence that it is attempting to exercise the power conferred by this section of the statute. It is not shown that any of the conditions exist to entitle it to exercise such power. No notice has been given, such as is required by the section; and without such notice the right of eminent domain cannot be exercised to effect such change in the original location. But it is too clear for argument that this provision of the statute was never intended to apply to a case like the present. It was certainly never intended to allow a change or deviation from a line of road out of the State to a new location within this State. The change of route here is from a line of road located in West Virginia, and without physical connection with that portion of the road located and constructed between Piedmont and the point of crossing the river below Keyser. There is no continuity of route in Maryland, and the change or deviation attempted is from the West Virginia road, and not from a Maryland road, and therefore the statute has no application to it. It cannot be supposed for a moment that the Legislature ever intended that a foreign railroad corporation, owning a road in an adjoining State, should have the power, by a change in the route of its railroad, to locate a route, or any portion of its route, within this State, and have the power to exercise the sovereign right of eminent domain, to secure its right of way. And if the Legislature has not expressly granted such power by statute, as it surely has not, clearly no such power can be derived by implication, from the certificate of incorporation of a domestic railroad company, simply because the latter has made a connection with a railroad located in an adjoining State. It is a principle of universal recognition, that the grants of franchises from the State are construed strictly, and most strictly in favor of the public and against the grantee. This is especially so in cases

where it is claimed that the power of eminent domain has been delegated by the State. In such cases it must be clear beyond reasonable doubt that the right is possessed by the party attempting its exercise, and the power granted must be strictly pursued, because it is against common right. *Charles River Bridge vs. Warren Bridge,* 11 *Pet.*, 544, 545; *N. Y. & H. R. Co. vs. Kip,* 46 *N. Y.,* 546.

It was the obvious policy of the State in passing the general railroad incorporation law of 1876, ch. 242, to encourage and facilitate the construction of railroads within our State. All railroads that may be constructed under the provisions of that law, were intended to be exclusively under the control and jurisdiction of this State, and in no manner to be subject to the jurisdiction and control of another State. Located as this road appears to be, this State will have but a very partial jurisdiction over it. It will be strictly an inter-state road; and this State will neither be able to regulate the rates of tolls and charges upon it, nor exercise power for keeping it in repair and safe-working condition for the protection of the public. In my opinion, it never was the intention of the Legislature that the provisions of the general railroad law should be applied in such a case as this. And without saying that so much of the road as may be constructed on the route prescribed in the certificate of incorporation is without warrant of law, I am clearly of opinion that that part of the proposed road which departs from the road in West Virginia below Keyser, and crosses the river into Maryland, runs through the Cookerly farm, and again crosses the river back into West Virginia, is not embraced or authorized by the certificate of incorporation, and consequently the right to exercise the power of eminent domain cannot be availed of by the corporation to secure the right of way for its road in the location of that part of it. And entertaining these views upon the subject, I

am constrained to dissent from the construction of the certificate of incorporation, and the Act of 1876, adopted by the majority of the Court.

(Filed 23rd June, 1887.)