This is an appeal from a judgment of the Circuit Court for Prince George's County that the property described in the proceedings in this case and the interest and estate of all the parties to said cause be condemned. The petition was filed by the appellee against the Mayor and Common Council of Hyattsville and others, under the Act of 1912, Chapter 117, and none of the defendants answered excepting the appellant. A number of objections to the condemnation were made, which will be considered in the order presented in the appellant's brief:
First. It is alleged that the petition is bad in substance and insufficient in law to form the basis of a judgment of condemnation. We do not deem it necessary to discuss this objection at length, as section 2 of Article 33A of the Code, as enacted by the Act of 1912, provides what shall be set forth in the petition, and there can be no doubt that this one sufficiently complies with those requirements.
Second. The next objection is that the appellee is not a duly, legally and validly incorporated company under the laws of this State, and is not, therefore, entitled to exercise the right of eminent domain. This objection is the most important one before us, and we must admit that it has not been entirely free from difficulty. The appellee was incorporated under the General Rail Road Law of the State in 1897. As the Code of 1888 was the one then in use we will refer to the numbers of the sections of Article 23 therein given, and will for convenience insert in brackets the numbers of the corresponding sections in the Code of 1912. Article *Page 131 
23, section 159 (261), provides that certificates of incorporation of railroad companies shall specify "first, the name assumed by such company and by which it shall be known; second, the name of the places of the termini of said road, and the county or counties, city or cities, through which such road shall pass; third, the amount of capital stock necessary to construct such road." The certificate of this corporation includes the following: "1. The name of said railroad company is the Washington, Westminster and Gettysburg Railroad Company. 2. The termini of said railroad are Washington, D.C., and Gettysburg, Pa., and its main line is to run through the counties of Montgomery, Howard, Frederick and Carroll, Maryland, also with a branch line from a point in the vicinity of Sand Spring, or Laytonsville, in a westerly direction to Frederick, in Frederick county, Maryland. 3. The capital stock of said company shall be one hundred thousand dollars, divided into two thousand shares of the par value of fifty dollars each."
In December, 1910, section 2 of that charter was amended so as to include Prince George's county, it being in other respects the same as that section in the original certificate. It will be observed that the termini given in the certificate are "Washington, D.C., and Gettysburg, Pa." It is contended on the part of the appellee that the statute does not provide that the termini shall be in this State and hence it is not so required, but there can be no doubt that the Legislature did not attempt to authorize the construction of railroads between points outside of the State, for in the first place it had no power to do so, and as it was passing a General Railroad Law for Maryland, when it required the certificate to specify what it stated in the second clause, it must have meant the places of the termini in Maryland, just as it did the county or counties, city or cities in Maryland.
Section 161 (263) strongly indicates that the Legislature intended that the termini in this State should be in some way fixed in the certificate. That section confers powers which are essential to a railroad company and it says: "Such corporations *Page 132 
shall be authorized to construct and maintain a railroad with a single or double track, with such side tracks, turnouts, offices and depots, as they may deem necessary, between the points namedin the certificate, commencing at or within and extending to or into any town, city or village named as the place of termini of such road," etc. It is perfectly certain that the Legislature of Maryland could not authorize the construction and maintenance of a railroad outside of the State, and when it did so authorize the construction of a railroad and other improvements mentioned "between the points named in the certificate," it must have intended that those points should be in this State. It is true it was said in Union R. Co. v. Canton R. Co., 105 Md. 18, that that section "does not relate to the requisites of the certificate, but to the exercise of the powers thereby conferred, in constructing the projected railroad `between the points named in the certificate,'" but it does reflect upon the question we now have before us. That expression was used in connection with the point involved in that case — whether it was necessary that the termini should begin at or in a town, city or village, and it was held that it was not, but the Court in the same paragraph referred to the case of Piedmont Cumberland Ry. Co. v.Speelman, 67 Md. 260, and quoted from page 274 that "The law of this State requires the termini to be fixed in this State, with reasonable certainty, and the cities (if any) through or near which the road is to pass."
The learned judge below was in error when he said in his opinion that one of the termini mentioned in the charter of the railroad involved in the Speelman case was in West Virginia. As shown on page 271 of 67 Md. one of them was at a point in Allegany county, Maryland, opposite a place in West Virginia, and the other was at Cumberland, as construed by the Court. The principal questions in that case were: (1st), whether a railroad chartered under the General Laws of the State could between its termini cross into another State and then re-cross into Maryland; and *Page 133 
(2nd), whether under that particular charter the company was authorized to exercise the power of eminent domain at the place in controversy. The Court said: "Of course the State of Maryland has nothing to do with the road in West Virginia, but she can permit by either general or special law the road to run beyond her limits and return. No possible reason can exist why, under the general law, a railroad lying on the border of a State may not be built partly in one State and partly in another. The conformation of the country may make it a necessity to do so, or the public interest, which, as Mr. Wood says, is the interest of the stockholders, may make it desirable to do so. For these reasons we think that a road lying near the border line between two States may lie partly in one and partly in the other. The law of this State requires the termini to be fixed in this State, with reasonable certainty, and the cities (if any) through or near which the road is to pass. We think the termini have been fixed in this charter, good faith has been observed, and the towns have been named." The Court went on to say that "a Maryland law could not compel a corporation to go out of the State, all it could do is to give it permission to do so."
That opinion stated in so many words that "the law of this State requires the termini to be fixed in this State, with reasonable certainty," and that was repeated in Union R. Co. v.Canton R. Co. It can not therefore be correctly said that this Court has never said that the termini should be fixed in this State. It is true that the termini named in the charter in theSpeelman case were both in this State, but the validity of the charter was assailed and the expression was used in connection with the discussion as to whether a railroad so situated could cross into another State and then re-cross into this State. The statement as to the termini was probably made to avoid any misunderstanding, owing to what had been said as to the right to go out of the State, but however that may be it indicates what the views of this Court at that time were, and as late as 1907 it was quoted without qualification. It therefore seems clear to us that under a *Page 134 
proper construction of the statute and under those decisions, the termini must in some way be fixed in this State with reasonable certainty.
The next question then is whether we can treat the dividing line between the District of Columbia and Maryland and that between Pennsylvania and Maryland as the real termini in this State and whether those points are sufficiently definite to be a compliance with the statute. Inasmuch as it is settled by the two cases above cited that it is not necessary to name a city, town or village as a terminus, if the points at which this road was to cross the State lines are fixed with sufficient certainty that would be a substantial compliance with the statute, notwithstanding what we have said above. As it was said in theSpeelman case that "The law of this State requires the terminito be fixed in this State with reasonable certainty," and inasmuch as we have said that the Statute requires the termini to be in this State, if the route of the railroad is fixed with sufficient certainty at the State lines, the mere fact that there are references to points outside of the State, but close to it, would not necessarily make the description invalid. If the lines of Washington are co-extensive with those of the District, that would be sufficiently for the southerly terminus, for if, for example, one terminus of a railroad was Baltimore City, it would not be necessary to name the particular street or part of the city to or from which it ran. Whether or not those lines are co-extensive is not shown in the record, and as the attorneys for the respective parties differed at the argument as to that, we are not at liberty to determine that question under this record.
But if we assume that the lines of the City of Washington are not co-extensive with those of the District, and that the limits of Washington are still what they were before the changes were made in the government of the District, apparently, and so far as we can tell from the map, a line from Washington to Gettysburg, passing through the counties named in the charter and going by Westminster, would cross the District line into Prince George's county and there would *Page 135 
not be a very great distance along the division line within which it could cross. The route named in the charter indicates that it is to be at or near Sandy Spring or Laytonsville, and the name of the company indicates that it is to go to or by Westminster. C. P.R. Co. v. Speer, 56 Pa. St. 325. The City of Washington, as built up, is at most only a few miles from the District line, and Gettysburg is not far from the dividing line between Maryland and Pennsylvania. If then a road be built from Washington to Gettysburg, through Prince George's and the other counties named and by Westminster, the point at which it would cross the Pennsylvania line could apparently be fixed with reasonable certainty. It is not necessary that the precise point shall be named. In Union R. Co. v. Canton R. Co., supra, the Court, after referring to the requirements of the general law said, on page 17: "The language of the provisions in question may be somewhat lacking in clearness, but the question here is not one of philological accuracy in the expressions employed therein, but of legislative intent upon a view of the whole statute and of the object of it. This Court has said that the statute in question is of remedial character and to be liberally construed. Piedmont Cumb. Ry. Co. v. Speelman, 67 Md. 260. Its object is to promote and facilitate the organization of corporations for the building of railroads and supplying means of transportation as the necessities and convenience of any community in the State and its industrial and commercial development may require. Where doubt may be suggested as to the construction of the law it ought to be resolved with a view of bringing the practical operation of the law into harmony with its purposes."
Again it was said on pages 17-18: "In requiring that the termini shall be specified in its act of incorporation, it would seem that the only reasonable intent to be imputed to the law is that the railroad shall have such termini definitely ascertained and fixed so as to indicate its general direction and location. This would be sufficient in a special charter conferred directly by the Act of the Legislature. Why should *Page 136 
it be otherwise in a charter authorized to be formed under a general law having the object which has already been indicated and intended only to obviate the necessity of a special charter in conditions making the incorporation of a railroad company expedient or desirable? Where the Legislature has not in express terms indicated that there is to be a difference between a special charter and one authorized by the general law in the regard mentioned, the Court ought not to be astute in finding one where there is not apparent a reason therefor. The law does not in terms require the termini of a railroad incorporated under the general laws to be at or in a town, village or city; and while it does require the `names of the places of the termini' to be specified the reasonable import of this language is that it is only the equivalent of requiring that the places or points of the termini shall be definitely designated and fixed."
It was said in Speelman's case that: "The general railroad law of the State is a remedial statute, and is therefore to be construed liberally. Good faith and reasonable certainty are all that is required. In passing that law, the Legislature distinctly recognized the benefit of railroads to the community and did away with the old cumbersome and expensive mode of obtaining by legislative action the right to build them. It was the manifest object of that law to enlarge and not to restrict the construction of railroads. The general railroad law (Act of 1876, Chapter 242) stands in the place of and is a substitute for the old special charter, and if the route laid down in the certificate of the Piedmont Cumberland road would have been sufficiently certain in a special charter, we apprehend that it will be sufficient in this charter."
Those opinions undoubtedly contain very broad statements, but one of them was delivered over twenty-five years ago and no change has been made in the statute. There is one fact worthy of consideration, and that is that if this charter be declared invalid by reason of the alleged defect spoken of, the parties in interest could at once take out a new charter, *Page 137 
locate the road precisely as this one has been located (giving more definite description of the termini, etc.) and by appropriate proceedings transfer the property thus far acquired to the new company. In other words, there is nothing under our general law which would prohibit a road from being built along the route proposed by this company, and there is nothing to suggest any bad faith on the part of the incorporators in describing the route in the manner it is described. The charter was submitted to a judge and certified by him to be in conformity with the law, and while under the case of Oler v. Balto. Randallstown R.R. Co., 41 Md. 583, and other authorities which might be cited, that certificate is not final and does not prevent the legal existence of the supposed corporation being inquired into, such a certificate should at least cause a Court called upon to pass on the legal existence of a company to be very cautious about declaring it invalid.
A number of special charters have been granted in this State in which one or both of the termini were more uncertain and indefinite than those in this charter, if we treat the termini in this State as the points where the route crosses the State lines from Washington and Gettysburg. The B. O.R.R. Co.'s charter authorized the construction of the road from the City of Baltimore to some suitable point on the Ohio River, to be by the president and directors determined. The Washington branch of that road was authorized to be constructed from such point or place on the line already built, not exceeding eight miles from the City of Baltimore, as the said company might deem most convenient, to the line of the State adjoining the District of Columbia, in a direction towards the City of Washington, and others might be mentioned. While it is true they were special charters, in view of what has been said in Speelman's case and that of theCanton R. Co. in reference to such charters, it would be going very far to hold that this company although chartered under the general law would not have sufficiently described its termini, if it had named as one the point on the District line at or about a point where a road from Washington to *Page 138 
Gettysburg would cross it, and the other on the Pennsylvania line where the road from Westminster to Gettysburg would cross it. As the termini must be fixed in this State, section 2 of the charter when taken in connection with the name of the company may be construed to mean what we have just said would have been sufficient, but before a Court should accept as sufficient such a description as is given in this charter, it should require testimony to be taken to show how far the points named are from the State lines and other evidence necessary for it to determine whether the beginning and ending of the road in Maryland are made sufficiently certain by reference to Washington, D.C., and Gettysburg, Pa., taken in connection with other parts of the charter. The case was submitted to the Court on the petition, answer and exhibits without any evidence and there was apparently not even a map showing the general direction of the road. We might add that the case of Atlantic Ohio R.R. Co. v.Sullivant, 5 Ohio St. 276, referred to by the appellant, is perhaps the strongest case cited by it in its supplemental brief, but it will be seen by an examination of that charter that it left to the discretion of the company to determine which of certain counties the road should pass through and the route was hence altogether indefinite.
Third. Objection is also made because Hyattsville is not mentioned in the charter as one of the cities through or near which the road was to run. The law can scarcely mean that every incorporated town or village through or by which the road is eventually laid out must be described in the charter. It is next to impossible in most cases for the incorporators of a railroad to know in advance the precise route the road will ultimately take. It can sometimes only be definitely ascertained after a number of expensive surveys are made, and until the corporation comes into existence there would be no way of providing for such expenses unless the incorporators themselves furnish the means. It certainly would not invalidate a charter by leaving one of them out, for it could not be assumed that a road would necessarily pass *Page 139 
through a town not named. The object of the provision is to give the general location and direction of the proposed road. In view of the great change made by the railroad under consideration inSpeelman's case, even from the route designated in the charter to a very different one, which change was sustained, it can not be doubted that after a charter is filed a railroad company can establish a different line between the termini from that originally contemplated. If there be any reason not apparent on the record for Hyattsville being named, the charter, if otherwise valid, can be readily amended so as to authorize the construction of the road by that town.
Fourth. The objection that the charter says: "The capital stock of said company shall be one hundred thousand dollars," instead of stating it as the amount necessary to construct the road, does not seem to us to be a substantial one. It is impossible in many instances to know in advance what the construction of a railroad will actually cost, as that depends upon so many conditions which are necessarily undetermined when the charter is taken out — especially if a departure from the contemplated route becomes necessary — but when the charter stated the amount of capital stock of the company, presumably it meant the amount necessary as far as that could be determined.
Fifth. As the Public Service Commission seems to have given its consent to the construction of the part of the road which affects the appellant we can not see how it can object on the ground that its consent only covers part of the road. The provision referred to in the order of June 20th, 1912, does not attempt to affect the construction, but it says "that before such construction is begun over, upon or under any public road or street a copy of the order or ordinance by which the use of such road or street is granted shall be filed in these proceedings."
Sixth. It is contended that the appellee can not condemn a right of way over the highway known as Columbia avenue. If the appellant's point be correct, then any municipality *Page 140 
could stop the construction of a railroad, simply by refusing to agree to permit it to cross. There can be no doubt that our law is ample to authorize a railroad company to construct, if necessary, a crossing over a public highway. Article 23, § 169 (273), provides for a railroad occupying any road, street, alley or public way by agreement, or if unable to agree, by condemnation, and if it could not cross such road, street, etc., it would certainly be remarkable that it could occupy it longitudinally, but could not cross it. The authority to cross land already devoted to public use may be given by express provision or by necessary implication, 8 Am. Eng. Ency. ofLaw 358, and such provisions as section 169 (273), section 173 (278), and others which might be referred to seem to be ample. Section 7 of Article 33A substitutes the proceedings adopted by that article for all others, excepting opening, etc., of highways.
Seventh. The fact that appellant is vested with power of supervision and control over its highways can make no difference. The same may be said of other public authorities having control over highways. Nor is there any force in the suggestion that the charter of Hyattsville is a public local law, as such is the case with every municipal corporation within the State. If it has any right in Columbia avenue, as it contends it has and probably has, just why such right can not be condemned if an agreement can not be made, is not satisfactorily shown. Of course when a railroad company crosses a highway, the crossing is subject to the existing public right to use it, and the right to cross must be exercised so as not to unnecessarily interfere with the right of the public to use it. Care should be taken in the construction of the crossing and for the protection of the public.
The order of the Court "that said property described in the proceedings in this case and the interest and estate of all the parties to said cause therein be condemned," should be limited to the purposes of a crossing and subject to the rights of the public. Section 5 of Article 33A says: "The title acquired in any condemnation proceeding under this *Page 141 
Act shall be absolute, or fee simple, or all the right, title and interest of all the parties to the proceedings, unless otherwise specified in the judgment of condemnation," and there should be no uncertainty about that in a case such as this, where the public will still have the right to use the street.
In our judgment, then, the general railroad law of this State requires the termini to be fixed in this State, and naming two cities out of the State as the termini would not ordinarily be sufficient to show a compliance with the statute in that respect. But we are also of the opinion, as indicated and explained above, that if it be shown by evidence that a road running from Washington, D.C., to Gettysburg, Pa., through the counties and at or near the towns mentioned in this charter, will cross the State lines within such distance that the points of crossing can be said to be fixed with reasonable certainty, in the light of the decisions above referred to and of what we have said, such points can be treated as the termini in this State, and hence, if such be the case, the description of the termini in this charter must be treated as a substantial compliance with the requirement of the statute. And if it be shown that the lines of Washington and of the District of Columbia are co-extensive that is sufficient for the southerly terminus. The record shows that the judgment of condemnation was entered on the petition and exhibits and the answer and exhibits, without other evidence. As we think they were insufficient of themselves we will reverse the judgment and remand the case for further proceedings, in reference to this and other matters indicated in this opinion or properly arising at the rehearing.
Judgment reversed, and case remanded, the costs in this Courtto be paid by the appellee. *Page 142