This case was before us several terms ago and the conclusions then reached by us are reported in 120 Md. 128. The question which then gave us most difficulty was whether the termini were sufficiently described to comply with our statute. After considering the various points presented, we said: "In our judgment, then, the general railroad law of this State requires the termini to be fixed in this State, and naming two cities out of the State as the termini would not ordinarily be sufficient to show a compliance with the statute in that respect. But we are also of the opinion, as indicated and explained above, that if it be shown by evidence that a road running from Washington, D.C., to Gettysburg, Pa., through the counties and at or near the towns mentioned in this charter, will cross the State lines within such distance that the points of crossing can be said to be fixed with reasonable certainty, in the light of the decisions above referred to and of what we have said, such points can be treated as the termini in this State, and hence, if such be the case, the description of the termini in this charter must be treated as a substantial compliance with the requirement of the statute. And if it be shown that the lines of Washington and of the District of Columbia are co-extensive, that is sufficient for the southerly terminus." *Page 663 
It was contended in the former case by the attorneys for the appellee that those lines were co-extensive, and it was for that reason that they were referred to. The testimony taken after the case was remanded does not sustain that contention. It may be true that there is but one government for the whole district, including the City of Washington, but the limits of the city seem to be well established and are practically the same they have been for many years, excepting that Georgetown is now a part of Washington.
If Washington and Gettysburg had been within the State of Maryland, naming them as the termini of the railroad would have been sufficient, without stating from what part of the one the road was to begin, and at what part of the other it was to terminate. The theory upon which we remanded the case, therefore, was that if it could be shown that a railroad constructed from the one place to the other, and passing through the counties and by or near the towns named, would cross the State lines within such distances on those lines as made those points of crossing reasonably certain and fixed then those points could be accepted as the termini of the road. It was determined in Union R. Co. v. Canton R. Co., 105 Md. 12, that it was not necessary under our statute that a railroad company shall have its termini at or in a city, town or village, and in the charter involved in P. C. Ry. Co. v. Speelman, 67 Md. 260, the description of the one terminus was "beginning at a point in Allegany County, in said State, opposite to the junction of the West Virginia Central and Pittsburg Railway Company with the Baltimore and Ohio Railroad Company above Piedmont, in West Virginia." Therefore reference to a point at either State line on a road to be built from Washington, D.C., to Gettysburg, Pa., would answer the requirement of the statute if such point could be made sufficiently definite. It was said in Union R. Co. v. CantonR. Co., supra, that "In requiring that the termini shall be specified in its act of incorporation, it would seem that the only reasonable intent to be imputed to the law is that the railroad shall have such termini definitely *Page 664 
ascertained and fixed so as to indicate its general direction and location." That there can be no objection to a railroad being chartered in this State with the view to connect with and in effect form part of a road chartered by another State was decided in P. C. Ry. Co. v. Speelman, and the conditions shown in that case still exist, just as in the part of the Western Maryland system east of Cumberland, where the road crosses and re-crosses the Potomac River a number of times.
We said in the former opinion that if the lines of Washington were co-extensive with those of the District, a point on the dividing line between the District and Maryland "would be sufficient for the southerly terminus, for if, for example, one terminus of a railroad was Baltimore City, it would not be necessary to name the particular street or part of the city to or from which it ran." We spoke of the fact that there were a number of special charters in this State in which there is more uncertainty as to one or both of the termini than in this charter, if we treat its termini, in this State, as the points where the route crosses the State lines from Washington and Gettysburg; and we referred to Spellman's case and that ofUnion R. Co. v. Canton R. Co., to show that this Court had in effect placed railroads chartered under the general law on the same basis as those having special charters, in respect to their termini and routes. The Baltimore Ohio R.R. was not only one of the first built in this country, but its charter has been the guide in this State in granting charters to other railroads, in reference to the description of routes, the exercise of eminent domain and in other respects. Chapter 158 of the Acts of 1830 was the original Act by which what is known as the Washington Branch of that company was authorized, being entitled "An Act to promote Internal Improvement, by the construction of a railroad from Baltimore to the City of Washington." That company was empowered and authorized to construct that railroad "from such point or place on *Page 665 
that part of the Baltimore and Ohio Rail Road already constructed, and in use, not exceeding eight miles from the City of Baltimore, as the said company may deem most convenient, to the line of this State adjoining the District of Columbia in a direction towards the City of Washington, along the most direct and suitable route that may be reasonably and conveniently practicable."
The precise point of crossing the State or District line was certainly as indefinite in the route of a road from the beginning named to the District line "in a direction towards the City of Washington," as the point of crossing such line would be in the route of a road from the City of Washington to Gettysburg, through the counties and at or near the towns named in this charter. It is true that was a special charter, but in view of what was said in the cases above referred to we would not be at liberty to strike down this charter merely because the precise point of crossing the line was not fixed, when the general direction and location of the railroad are indicated by the description given, and that special charter, moreover, does show that the Legislature of this State did not deem it necessary to fix in advance the precise point of crossing State lines. Chapter 634 of Acts of 1900, which changed the name of the Frederick, Thurmont and Northern Railway Company to the Washington, Frederick and Gettysburg Railway Company, authorized that company to construct a railroad from some point in Frederick City "to some point at or near the boundary line between the State of Maryland and the State of Pennsylvania, and run through or near the towns of Thurmont and Emmittsburg, in said Frederick County, and to extend from Frederick City southerly through Frederick and Montgomery Counties to the boundary line of the District of Columbia, or to such point in Montgomery County as may, by said directors, be deemed most expedient to connect with some railroad entering said District of Columbia." Other special charters might be cited, and while we do not mean *Page 666 
to say that the legislature could not, by a special charter, grant some special powers which the general law does not, such designations of termini as those we have mentioned reflect upon the intent of the legislature in reference to them. We will repeat what we quoted in the other opinion from the case ofUnion R. Co. v. Canton R. Co., in speaking of the provisions of the general law as to termini. It was there said: "The language of the provisions in question may be somewhat lacking in clearness, but the question here is not one of philological accuracy in the expressions employed therein, but of legislative intent upon a view of the whole statute, and of the object of it. This Court has said that the statute in question is of remedial character and to be liberally construed; Piedmont and Cumb. Ry.Co. v. Speelman, 67 Md. 260. Its object is to promote and facilitate the organization of corporations for the building of railroads and supplying means of transportation as the necessities and convenience of any community in the State and its industrial and commercial development may require. Where doubt may be suggested as to the construction of the law, it ought to be resolved with a view of bringing the practical operation of the law into harmony with its purposes."
In determining the sufficiency of the description of the termini in this charter, we must be controlled by the former decisions of this Court and particularly by what we believe the legislature intended to require. Some cases in other jurisdictions have, it seems to us, announced stricter rules in reference to the description of the termini than are necessary for the protection of the public or those interested in railroad companies. It is generally conceded that the precise route between the termini must to a great extent be left to the discretion of the company — it may be above or below, or partly above and partly below, or close to or some distance from a direct line between the termini, unless otherwise fixed in the charter, and yet some authorities would seem to limit the termini to very circumscribed spaces. The better rule is *Page 667 
to require them to be designated and fixed with reasonable certainty, and what is reasonable certainty must depend upon circumstances. It might be well to require a map or maps to be filed of the proposed location of a railroad within some designated time after a charter is taken out, but it would be practically impossible to definitely locate the precise route before the company is incorporated, as that must depend upon circumstances which may arise after the company is chartered, and we have quoted above from Union R. Co. v. Canton R. Co., to show the intent of the law in requiring the termini to be fixed in the charter.
But having already held that if the lines of Washington are co extensive with those of the District that would be sufficient for the southerly terminus, it would seem that logically the District line should be held to be sufficient. No greater distance is covered by it as the District line than would have been if it had been found to be a line of Washington City. The map of the route of the railroad is now in the case, and that not only shows the point on the District line, but the route of the road to the Pennsylvania line. In order to pass through Prince George's, Montgomery, Howard, Carroll and Frederick counties, by what would approach anything like a direct line to Gettysburg, the road must cross the District line and the Pennsylvania line within such reasonable distances as to satisfy us the termini so fixed are a sufficient compliance with our statute. Westminster is almost due north of Sandy Springs, and the route from the District to Westminster, via Sandy Spring, is about as direct as a railroad usually is in such a country as this passes through — especially where there are other railroads to be taken into consideration. The distance from Westminster to the Pennsylvania line is a little over sixteen miles, and from that line to Gettysburg a little over thirteen miles, according to the evidence of the general manager of the road, who said it was practically an air line. So without pursuing the subject *Page 668 
further we are satisfied that treating the termini in the charter as the points of crossing the two State lines, they are sufficiently designated.
It only remains to consider the exceptions presented by the record. The first was to the refusal of the Court to have a trial by jury. At the time the appellant filed its election for a trial by a jury the pleadings did not raise any issue of fact which a jury could pass on. It was for the Court, and not for the jury, to determine whether the charter was a valid one, and the evidence to be offered on that subject was for the Court. If the termini were sufficiently described, a copy of the charter duly certified by the Secretary of State is made evidence of the existence of the company, section 261 of Article 23, and by section 262, when the provisions of section 261 have been complied with, the persons named as corporators in the certificate are authorized to carry into effect the objects named therein, and they and their associates, successors and assigns, shall thereafter be deemed a body corporate, etc. When a corporation is formed under the general law no further proof is required to show that the persons who signed the articles and applied for the charter have accepted it, other than their compliance with the provisions of the statute. Glymont Co. v.Toler, 80 Md. 278. For the reasons stated in the opinion in the former appeal, we deemed it proper to have evidence, so that the Court could determine the sufficiency of the description of the termini in the charter, as without the evidence it was not satisfactorily informed as to where the proposed road would cross the State lines, but it was not intended that a jury should pass on such questions, as whether there was such a corporation, the distance from the point where the proposed road crossed the State line to Gettysburg, whether or not the lines of Washington and the District were co-extensive, etc. Nor do we think that any of the other questions of fact suggested by the appellant were at issue at the time the jury was asked for. *Page 669 
The second exception was taken to the refusal of the Court to allow the appellant to amend its answer so as to plead as matter of defense an order of the Public Service Commission, passed since the pleadings in this case were filed, where by said commission suspended until its further order the operation and effect of its previous order referred to in the petition of the appellee. As the Court subsequently permitted the appellant to file the order no injury was done it by refusing to allow it to amend. if it be conceded that such action is subject to review.
In the third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, sixteenth and seventeenth exceptions there were no reversible errors. Some of them are wholly immaterial as they relate to the question whether the lines of the City and the District were co-extensive, and we have already said we are satisfied they are not. It was proper to have the officers of the company explain to the Court the route of the proposed road, and there could be no valid objection to the use of maps by way of illustration in doing so. It was competent for the officers to give the distances between Westminster and the State line, and between the latter and Gettysburg. It must be remembered that all of that character of testimony was intended to enlighten the Court as to the approximate distances between those points, and it was not essential to prove the exact distances.
The eighteenth exception embraces a prayer in which the appellant asked the Court to enter judgment for the defendant and to dismiss the petition for eleven reasons set out in the prayer, which we will consider in the order named: 1. There is no merit in the first ground as the interests of the other parties were not contested, and the proceeding was continued against the appellant which alone contested the right of the appellee to condemn. It could do the appellant no harm even if a necessary party had been omitted. 2. As *Page 670 
the order of the Court expressly limited the right of appellee to condemn an easement, the second ground is likewise immaterial. 3. What we have already said as to the acceptance of the charter is sufficient. 4. As the general manager of the company testified that "he knew the proposed route was adopted by the stockholders and also by the board of directors," there was evidence, which went in without objection, that the route had been approved by both. 5. There can be no doubt from the case before us that the company has authorized these proceedings. 6. The answer of the appellant to the petition of the appellee is ample to show that they have been unable to agree, and the fact that the right of the appellee to condemn this easement has been in Court for over eighteen months, certainly does not tend to show the contrary. 7. We cannot agree with the appellant's construction of what the law means when it speaks of it being necessary to acquire certain property. When a railroad company can adopt one of two or more routes between its termini, it never could exercise the power of eminent domain if appellant's contention is correct. If it undertook to condemn property along one route, the owners could contend that it was not necessary because it could take another route, and if it adopted the other route an owner there could go through the same obstructive processes. That is not what the authorities mean, but what is meant is illustrated by the case ofNew Central Coal Co. v. George's Creek Coal and Iron Co.,37 Md. 537, where it was alleged that the two companies owned adjoining lands and the condemning company sought to take the property of the other company instead of using its own to reach its destination. JUDGE ALVEY said: "To justify the exercise of this extreme power, where the Legislature has left it to depend upon the necessity that may be found to exist, in order to accomplish the purposes of the incorporation, as in this case, the party claiming the right to the exercise of the power should be required to show at least a *Page 671 
reasonable degree of necessity for its exercise." But he had previously said: "The general rule doubtless is, as applicable to a railroad to be located between given termini, the act of incorporation not defining the precise location, that the managers or directors of the corporation are made the sole judges of what is proper or convenient, as well with reference to location, as to the execution of all other powers granted, as means of attaining the objects of the charter."
In this case it was shown that the route of the proposed road crossed Columbia Avenue and there is nothing in the record to show that the route adopted was an unreasonable or improper one. If the road is built on that route, there can be no doubt that it is necessary to cross Columbia Avenue, unless that could be avoided by adopting some circuitous route which would go around Hyattsville, but that might require it to cross some other public highway, which it does not now cross, the crossing of which would be equally objectionable to those interested in that highway. It may be observed here that in our judgment it is for the Court, and not for a jury to determine whether it is necessary to condemn any particular property, excepting in so far as the Public Service Commission may pass on that question under section 438 of Article 23. That was so in Maryland prior to the Act of 1912, which did not change the rule. There may be cases in which it will be proper to submit to a jury certain questions of fact in connection with that subject, but there is nothing in this case which suggests any reason for submitting to a jury any matter reflecting upon the question of necessity to condemn this crossing. 8. The map filed with the petition designates the property sought to be condemned 9. We have already said all that is necessary as to the termini. 10. This reason is too indefinite to be passed on by this Court. 11. This reason was intended to present what is perhaps the most important question in this appeal. It is as follows: "Because the petitioner, purporting to be a railroad *Page 672 
corporation chartered under the laws of this State, can not exercise any franchise or right under the railroad law, or any other law, without the permission and approval of the Public Service Commission and the petitioner has wholly failed to prove that it has such permission and approval from said commission for the exercise of the rights attempted to be exercised by it in these proceedings, and in fact the petitioner has no such permission and approval."
On the 20th of June, 1912, the Public Service Commission passed an order which contained the following: "Ordered, that the construction, equipment and operation by the Washington, Westminster and Gettysburg Railroad Company of its road from Brentwood, in Prince George's County. Maryland, to Sandy Spring, in Montgomery County, Maryland, a distance of about eighteen (18) miles over the route laid out in the blue-print filed with the original petition filed by said railroad company with this Commission (Case No. 89); and the exercise by said railroad company of franchises to cross public highways granted by the County Commissioners of Prince George's County and Montgomery County, respectively, and by the proper authority of any municipal corporation, are hereby permitted and approved, this Commission hereby determining that such construction and such exercise of franchises or privileges are convenient for the public service; provided, however, that before such construction is begun over, upon or under any public road or street a copy of the order or ordinance by which the use of such road or street is granted shall be filed in these proceedings."
The order then went on to authorize the issue of $144,000 of preferred stock, $100,000 of common stock and coupon bonds to the amount of $630,000, to be secured by a mortgage or deed of trust on the portion of the road thereby authorized to be constructed, and provided for certain reports to the Commission, etc.
On the 25th of June, 1913, the Commission passed an order as follows: "Ordered, that No. 779 passed in this case *Page 673 
on the 20th day of June, A.D. 1912, so far as it authorizes the construction, equipment and operation by the Washington, Westminster and Gettysburg Railroad Company of its road from Brentwood, in Prince George's County, Maryland, to Sandy Spring, in Montgomery County, Maryland, a distance of about eighteen miles, and so far as it authorizes the issue of said corporation of stock and bonds, be and the same is hereby suspended, until the Commission of its own motion, or upon the petition of said corporation, by appropriate order, revive and reinstate the same."
The latter order was passed just two days before the time at which this and the case of the City and Suburban R.R. Co. had been set for hearing by the lower Court, after they had been remanded by this Court. Whatever may be the rights and powers of the Public Service Commission in reference to railroads crossing public roads, streets, or other railroads, surely it cannot be that the Commission a year after it has passed such an important order as the one of June 20th, 1912, can, by suspending that order, stop condemnation proceedings actually pending in the Court having jurisdiction over them. The delays incident to the proceedings provided for by the Act of 1912, Chapter 117, are not calculated to attract new Public Service Companies to this State, but if after such proceedings as had already been taken in these cases the Commission could, by suspending its order passed a year before, put a stop to all further condemnation proceedings, the delays would become intolerable. We are not only of the opinion that the order of June 25th, 1913, could not have such effect but we are satisfied that such was not the intention of the Commission. The opinion filed by it on the same day shows conclusively that it was not intended to in any way interfere with the condemnation proceedings. It quoted from the findings of the Commission on June 20th, 1912, where it was said: "The difficulties at the crossing of the City and Suburban Railways Company's tracks and the crossing of Columbia avenue, in Hyattsville, *Page 674 
are now in the Courts under condemnation proceedings. When these difficulties are removed it will be the duty of the Commission, by appropriate orders, to provide safety appliances to protect the public. This order which will follow this finding will only cover the permission to begin construction and the authority to issue securities," and added: "This language seems to refute the view expressed by counsel for the company that the order permitted grade crossings at the places named. Such was not the intention of the Commission." The opinion then referred to the fact that the question of the validity of the company's charter had not been raised when the proceedings in June, 1912, were had and had not yet been determined, and added, "Under these circumstances we think the company should take no further steps under the order until the cases now pending in the Courts are disposed of. It would accomplish no practical purpose to spend money upon sections of the road not affected by litigation, with the risk of being permanently deprived of the ability to construct the entire road; and it would be both unwise and unfair to issue securities in the face of the uncertainties described above. So far as the crossings at Columbia avenue and the city and suburban tracks are concerned, the Commission will at an early date render a decision as to the method of construction at those points, so that the company will be fully advised of the conditions it must comply with."
It is therefore clear that the Commission did not claim to have the right to interfere with the condemnation proceedings, but on the contrary fully recognized the fact that the Court must determine whether the appellee had the right to exercise the power of eminent domain. In the case of the City and SuburbanR.R. Co. v. Wash., West. Gettysburg R.R. Co., 120 Md. 142, we said: "It will be well at the rehearing of the case by the lower Court to give the Commission the right to be heard, if it so desires, provided the Court determines the charter to be sufficient, after taking testimony *Page 675 
as pointed out in the opinion above referred to" (being that in the case reported in 120 Md. 128-141). Section 418 of Article 23, amended by Chapter 563 of Act of 1912, gives the Commission authority to direct its General Counsel, or other agent or instrumentality, to represent and appear for it in all actions and proceedings involving any question under that Act or under or in reference to any act, order or proceeding of the Commission, and, "to intervene, if possible, in any action or proceeding in which any such question is involved." It would therefore have been within the contemplation of the statute and might have avoided further trouble and delay if the Commission had been represented at the hearing, but as it did not appear, there was nothing left for the lower Court to do but to determine the questions before it as to the right of the appellee to condemn.
Section 438 of Article 23 provides that, "No common carrier, railroad corporation, or street railroad corporation, shall begin the construction of a railroad or street railroad, or any extension thereof, or exercise any franchise, or right under any provision of the railroad law, or of any other law, not heretofore lawfully exercised, without first having obtained the permission and approval of the Commission. The Commission shall have power to grant the permission and approval herein specified whenever it shall, after due hearing, determine that such construction or such exercise of the franchise or privilege is necessary or convenient for the public service." As we have seen above, the Commission had determined, "That such construction and such exercise of franchises or privileges are convenient for the public service," and the order of June, 1913, certainly did not expressly, and we do not understand it to have intended to alter that determination, but merely to suspend the construction, etc., until its further order.
Our statute does not in terms authorize the Public Service Commission to determine whether a railroad shall cross a public highway at, above, or under grade, but the language of *Page 676 
section 438 is so broad that in our judgment it has that power, subject of course to such review of the Court having jurisdiction thereof as to the reasonableness of the action of the Commission as is given by the statute. Indeed, it is said in the appellee's brief: "We have always been of the opinion that before a railroad could begin actual construction, first having obtained its rights of way, it must, under section 438 of Article 23 of the above Code, obtain the approval of the Public Service Commission to such construction," but it is contended that it must first acquire the right of way. It would certainly be better to have that determined before the Court passes the order authorizing the condemnation and it should at least be inquired into before the appraisers are appointed under the provisions of section 5 of Chapter 117 of the Act of 1912, as the award of damages may be affected by the method of crossing — at, above or under grade. InLewis on Em. Dom. (3rd ed.), sec. 424, in speaking of one railroad crossing another, it is said: "In the absence of statutory regulation, the place and manner of crossing are left, in the first instance, to the discretion of the crossing road,and it may condemn a right to cross generally or the right tocross in a specified manner." Following such a rule in this case, the condemnation of the right to cross generally would seem to be sufficient, but, as indicated above, we think the manner of crossing should first be determined. After that is finally settled by the Public Service Commission, the lower Court in appointing the appraisers can instruct them as to the method of crossing, as so determined, and its order of condemnation can be treated as so modified.
It follows that the order of the Court will be affirmed, and under the circumstances we will direct that each party pay one-half the costs in this Court.
Order affirmed, and case remanded, each party to pay one-halfthe costs in this Court. *Page 677