# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed February 22, 1916.

CHESAPEAKE AND CURTIS BAY RAILROAD COMPANY, A BODY CORPORATE,

VS.

ALBERT G. TOWERS, E. CLAY TIMANUS, W. LAIRD HENRY, CONSTITUTING THE PUBLIC SERVICE COMMISSION OF MARYLAND.

*William Cabell Bruce* for Public Service Commission.

*Chas. R. Webber* for Baltimore and Ohio Railroad Company.

*J. Cookman Boyd* for Curtis Bay Railroad Company.

HEUISLER, J.—

Under the provisions of Section 26, of the Public Service Commission Law of the State of Maryland, we find it enacted, "that *no common carrier,* railroad corporation, or street railroad corporation, *shall* begin the construction of a railroad or street railroad, or any extension thereof, or *exercise any franchise or right* under any provision of the railroad law, or of any other law not heretofore lawfully exercised, *without first having obtained the* permission and approval of the Commission The Commission shall have *power to grant* the permission and approval herein specified *whenever it shall, after due hearing, determine* that such construction or *such exercise of the franchise or privilege is necessary* or *convenient* for the public service."

And further in such law—and under the general provisions of the final paragraph of Section 11, and the special provisions of Section 43 thereof we find "that any corporation, subject to this act * * * being dissatisfied with *any order* of the Commission * * * fixing any regulations, *practices, acts* or *service,* may *commence any action* in the Circuit Court for any County, or before any Judge of the Supreme Bench of Baltimore City, in any Court of Baltimore City of appropriate jurisdiction which may be adopted for the purpose, *against the Commission as defendant* to vacate and set aside any such order on the ground that * * * any such regulation, practice, act or service fixed in such order is *unreasonable,* in which action a copy of the complaint shall be served with the summons."

These provisions of the law are extended into this opinion for the setting of two preliminary facts:

(a) No common carrier, railroad corporation or street railroad corporation shall exercise any franchise or right, in the State of Maryland, under any provision of the railroad law, without the permission and approval of its Public Service Commission; and, the said commission shall have power to hear and determine the application for such permission, and, after due hearing, grant or refuse such exercise of the franchise or privilege as it may or may not find the same to be necessary or convenient for the public service; (b) and that such order when made by the commission, shall not be unreasonable; and the Courts shall have full power of review and revision.

The duty devolving on the Court in this proceeding therefore is to determine whether certain orders of the Commission, which will hereafter be more specifically set out, are to be approved or vacated as *being reason-*

*able* or *unreasonable;* and as showing or failing to show that the exercise of the franchise or privilege,—the particular matter involved herein, is *necessary* or *convenient for the public service.* To reach a final conclusion in the matter, and bearing in mind the very distinct importance of the controversy, it was necessary to carefully and in detail examine and analyze the petitions, answers, orders, voluminous testimony, arguments and opinions which make up the very large record—and this has been patiently done.

On June 16, 1915, the Public Service Commission of Maryland was petitioned by the Chesapeake and Curtis Bay Railroad Company, a corporation, praying that the said Commission "grant its permission and approval for the purchase, construction, equipment and operation * * * of the line of railroad proposed to be purchased and constructed" as specifically set out in said petition; and for the "exercise of all the franchises and rights applicable thereto and necessary and convenient in the premises." In the petition there was set out in detail the line of the railroad and the authorized capital stock—and the certificate of incorporation was duly filed therewith; and it was also alleged therein that "the construction of said proposed Railroad Company is necessary, convenient and desirable for the public service." Upon filing of the petition it was ordered by the Commission that hearing be had thereon on June 23, 1915, provided a copy of said order be "published in some newspaper in Baltimore City, at least one time before the 21st day of June, 1915" and this was accordingly done. Before the date set for the said hearing a protest was filed, by the Baltimore and Ohio Railroad Company, against the granting of the order prayed for, the reasons alleged being as follows:

1. The Baltimore and Ohio Railroad Company has for a number of years made a systematic effort to develop the territory contiguous to Curtis Bay, and has developed said territory by the building of approximately seven miles of main tracks and sidings for the accommodation of industries situated inland and along the waterfront between Brooklyn and Curtis Bay; that it proposes further to develop said territory by increasing said trackage; that it serves each and all of the industries proposed to be served by the Chesapeake and Curtis Bay Railroad; that the exercise of its franchise by said Chesapeake and Curtis Bay Railroad would retard the development aforesaid and interfere with the plans of the Baltimore and Ohio Railroad Company for increasing its present facilities; that said territory is the only section adjacent to the City of Baltimore in which there is an opportunity for the Baltimore and Ohio Railroad to assist in the development of large manufacturing industries.

2. The Baltimore and Ohio Railroad Company is furnishing adequate facilities for all shippers whose plants are proposed to be served by the Chesapeake and Curtis Bay Railroad; that no complaints are being made to the Baltimore and Ohio Railroad Company with respect to facilities, accommodation or service; that no useful purpose would be served by the granting of the order asked for, and that the exercise of said franchise is neither necessary nor convenient for the public service."

After the filing of this protest—and on June 23rd, 1915, before Honorable W. Laird Henry, Commissioner, the hearing prayed for was begun, and postponed for final hearing until June 29th, 1915, on which day it was resumed before Towers and Henry, commissioners.

At this hearing, *John H. Zink,* General Manager of the United States Asphalt Refining Company, a witness produced on behalf of the applicant, testified; that the Inter-Ocean Oil Company, and the Asphalt Products Company, (an industry now not operating by reason of fire), at Curtis Bay, could not be served by the Baltimore and Ohio Railroad Company—because they could not be reached by it; that now, (29th June, 1915) the following industries were located in that territory, United States Asphalt Refining Company; Inter-Ocean Oil Company; Asphalt Products Company; Texas Oil Company; Martin Wagner Company; Prudential Oil Corporation; (test'y fol. 19)—and, that building of new road would enable all the industries at Curtis Bay to make "direct deliveries to both Western Maryland and Pennsylvania Railroads," (folio 19); that the new road will form a *connecting link with all trunk lines entering Bal-*

*timore*, and without that connecting link "all shipments must be made over the Baltimore and Ohio" (folio 20); that the new road is an *absolute necessity* and a business convenience for the industries there; under the old conditions no deliveries could be made except by Baltimore and Ohio, and it gave no adequate attention to the situation—*and complaints were constant* and response to complaints spasmodic and long delayed; after car float was located there by Western Maryland (and it began operations about April, 1915)—there was an improvement in the situation caused by its operation, (fol. 16); that the present trackage of proposed road is now owned by the United States Asphalt Refining Company; that the increase of business makes it impossible to longer use this road as a *plant facility*, and other concerns which have been using it (as such) must now have service discontinued."—(folio 29.)

*Edward D. Feist*, executive of system of Inter-Ocean Oil Company—witness produced on behalf of applicant, testified to necessity of payment by shippers of large sums of money for premium freight rates because of the want of trunk line connections; to the fact of delay in tank cars at junction points causing large excess of financial outlay by shippers—by reason of want of direct trunk line connections; that advent of new road will remedy these conditions: (folios 125-127); that there will be a business convenience to all the industries in this locality—following the allowance of the franchise; and that there is entire capacity in the new road to finance its operations. (fol. 140 et sequitur.) *Theodore H. Ellis*, consulting Engineer of the United States Asphalt Refining Company, a witness produced on behalf of the applicant testified that the "new railroad is a business necessity; to attempt to handle the freight that is going out there *now* with the traffic of the railroad, it would be almost impossible to distribute the charges for the service that is done and conduct the business.". (folio 159.)

*Herbert Sheridan*, Traffic Manager of the Baltimore Chamber of Commerce, and of the Canned Goods Exchange of Baltimore, a witness produced on behalf of applicant, testified, "the operation of the new road would be of great convenience to the indus-

trial situation in that territory; *it would mean very wholesome* competition." (folio 185.) "There would be a saving in transportation charges; it must be borne in mind that *there is not a product in Baltimore* that is not in strong competition with other markets—therefore this reasonable saving promotes that much more income of Maryland money because of the wider diffusion of Maryland products."— (folio 186.) "*Here is an opportunity* for the existing plants to ship in and out of Baltimore by way of the Baltimore and Ohio; and the Pennsylvania and the Western Maryland, at the flat Baltimore rate."—(folio 225.)

*A. E. Beeks*, Traffic Manager of the Merchants and Manufacturers' Association of Baltimore City, a witness produced on behalf of applicant, testified, "the body of water known as Curtis Bay is destined to become the deep water terminal of the Ocean lines; and the location of the gigantic industries in this part of the country; (folio 230); no industry now there or that may come there should be confined locally to the rails of any one railroad; the location of this new railroad there will fill a long felt want; I consider the building of this proposed railroad and the acquiring of the branches run for this proposed railroad absolutely necessary and convenient." (folio 233); there was no cross-examination of this witness, and at this point the applicant rested.

The protestant submitted the testimony of *B. F. Hanly*, an Assistant Division Engineer of the Baltimore and Ohio Railroad since December, 1914— who said that "the present branch tracks of the Baltimore and Ohio, connect with nearly all properties now there in such a manner as to perform a convenient transmission of freight over and delivering freight and cars to each of them." (folio 243); that there was practically 7.43 miles of rail built down there by the Baltimore and Ohio * * * including the Sea Wall Branch and the Curtis Bay Branch." (folio 244); that there was in contemplation the building of additional trackage—and that there would then be adequate facilities for shipping—and give "traffic for inbound loaded cars and outbound empty" (folio 242); and in answer to a categorical question "*In your opinion* could a more convenient means be provided in any case by the use of the

plant tracks of the United States Asphalt Refining Company?"—answered, "In my opinion, no sir" (folio 243).

*William W. Wood*, General Industrial Agent of the Baltimore and Ohio Railroad, produced on behalf of the protestant, testified, that largely by reason of his activities there had been large industrial developments in the Curtis Bay district;—and that a large sum of money for tracks and sidings had been spent by the Baltimore and Ohio, and that "exclusive of the coal pier, probably over one million dollars on the other side because we have very large yards there" (folios 258-259). That he has three offices, at Baltimore, Pittsburgh and Cincinnati; that complaints from industries placed by him in Baltimore are made directly to him —and that he has had no complaints here; (folio 256)—and in reply to the question, "*Can you think* of any advantage that would be gotten by any one of these industries by the use of this proposed plant facility incorporated as a railroad and any extensions that might be made—I mean with reference to the various industries that are there?"—answers, "If you want to say can we handle their business as a railroad, I will say yes—*and if we don't it is our own fault,* (folio 262).

*John P. Kavanaugh*, division Superintendent of the Baltimore Division, Baltimore and Ohio—a witness called on behalf of the protestant, testified that no complaint as to service being inadequate has ever been heard by him from any representative of the industries served by the Baltimore and Ohio in the Curtis Bay District during the three years that he has been on that division, except a complaint about three months ago from Mr. Zink; that was a complaint "in the way of tracks" —and that the condition has been remedied, but on cross-examination witness said that the promised improvement had not been made—because they could give adequate service without it; (folios 282-284) ; in answer to a question "In your opinion, Mr. Kavanaugh, do the branches of the Baltimore and Ohio provide a convenient means for receiving there and sending in to each of these plants?" Witness says (folio 277) "To say real convenience, no. We could be in better shape so far as convenience is concerned, but that is our disadvantage. It costs us a little more to operate with the conveniences we

have than it will to get the convenience we have arranged for."

*W. R. Askew*, Division Freight Agent, Baltimore and Ohio Railroad, produced as witness by protestant—after testifying in detail in explanation of the premium rate question, (folios 292-296) stated that complaint of inadequate facilities on the Sea Wall Branch had been made about a year ago; that they were "giving consideration to building trackage on the Sea Wall Branch"—as recommended by their Traffic Department, but that the additional trackage had not yet been built to his knowledge—because all improvements about that time, "a year or so ago" (folio 292) had been discontinued on account of financial conditions, (folio 299).

The direct testimony on both sides was then closed. After argument upon the evidence submitted—and before the filing of its first opinion, the Commission directed its *Transportation Expert, Mr. W. Bruce Duer*, to make an investigation and report to the Commission—and that report, a part of the record in this case—next demands the Court's attention. The expert reports that he has read the testimony in the case and walked over the ground of the present and proposed tracks, and "understanding that my recommendations should be based upon the evidence"—he reports that "*the principal questions to be determined*" are

(a) Is the proposed railroad a public necessity or public convenience?

(b) Is the road a bona fide common carrier?

(c) Is the service to be performed between the point of interchange with the trunk lines and the point of placement, plant service or public transportation?

Continuing he says, "I do not find that the proposed track will furnish facilities to any additional plants or public except that it does show a *possibility* of connecting up with the plant tracks of the Prudential Company. *In the past* it was not unusual where an industry had plant tracks without any common carrier characteristics to incorporate as a railroad * * * for the purpose of getting a division of the rates, remission of charges for detention of cars, etc., while only performing the same service which the industry had previously performed without com-

pensation. Therefore these shippers on account of their incorporated railway were allowed advantages over other shippers. In other words, it would result in *favoritism* and unfair advantage to particular shippers, and at the same time be quite a hardship on the trunk lines or *legitimate railroads* as well as the public. *This apparently* is the purpose of the applicant in this case—and it is the very thing that the Interstate Commerce Commission has been trying to break up and discourage. Still reporting, but leaving the realm of suggestion for that of analysis, the expert considering the two reasons *testified to* by the witnesses for the applicant, says *first as to the premium rates* that *practically* the industries "the Asphalt Company and its allied interests" can now enjoy flat rates because they have direct connection with both the "Western Maryland and the Pennsylvania Railroads by means of the Western Maryland float; and *legally* they can complain to the Interstate Commerce Commission and have matter regulated, and *Second, as to poor service* on account of inadequate track room on Baltimore and Ohio, says, "there is good ground for this complaint. I am convinced, from personal observation, that the Baltimore and Ohio did not have sufficient facilities or proper track lay out at this point to handle business promptly. *They have, however, agreed to put in the additonal facilities * * * *and these improvements should obviate the complaints as to poor service."—Concluding his report, the expert says, "it is my opinion that unless the applicant can produce better evidence to show that.

1. They will be a bona fide railroad, and

2. A public necessity or convenience; that "their request is without merit"; and thereafter and on October 1st, 1915, the first opinion of the commission was filed which, in brief, commits it to the following propositions:

(a) There must be a genuine holding out of public service so that the public may avail itself of such service.

(b) There must be a public to serve as well as an offer to serve the public.

(c) The manifest purpose of the applicant seems to be to have its charter granted and by means thereof to force a division of rates; to sap the vitality

of other responsible carriers; that no public necessity requires and no public convenience would be advanced, at the present time at least, by granting the petition.

Following this opinion and on the first of October, 1915, the petition *was dismissed;* and the 4th day of October, 1915, the Bill of Complaint in this case was filed praying that the adverse finding of the Commission and the dismissal of the petition be vacated, set aside and annulled and that the relief prayed for be granted, etc. On October 13th, 1915, the answer of the Commission was filed, through its Counsel, said answer averring, *inter alia,* that the following facts were established to the satisfaction of the Commission by competent, substantial and convincing testimony and evidence, viz: that at the time—"the railroad was but a plant service of about two miles, owned by and operated entirely on the property of the Asphalt Company, with switches and side tracks at convenient places for loading its own freight and that of two certain allied interests, and that it served no other person or corporation; had no stations; could be reached by no other shippers or the general public except over the lands of the United States Asphalt Refining Company; that it was destitute of any rolling stock except two switching locomotives and had no cars to move freight; that there was no general public along the line of said railroad to be served for either passenger or freight service; that the plaintiff was incorporated only for the purpose of taking over the railroad from the Asphalt Company—and operating it under or substantially under the same limited conditions as before for the three companies, and that the the said railroad for all practical purposes would be simply what it was formerly a private appendage and appurtenance of said three companies, "without any of the distinctive attributes or functions of a true common carrier or public service corporation; that the public convenience or necessity in the matter of transportation in that locality *was already fully taken care of* by the tracks and facilities of the Baltimore and Ohio: the car-floats of the Western Maryland and the Pennsylvania Railroad—and that the practical effect so far as the general public was concerned would be to enable the new road

—in the pretended character of a common carrier—to establish through and joint rates with the Baltimore and Ohio, and impose upon the general public—in increased rates—the cost of operating purely private facilities."

*Wherefore the defendants reached the conclusion*, that the plaintiff had no existence or standing as a common carrier or a public service corporation —and that they are without jurisdiction to approve the acquisition by the plaintiff of the railroad, or the exercise of any franchises by it or any issue of stock authorized by it; and that even if this were not so—the plaintiff had failed to make out any case of public convenience or necessity that would warrant the Commission in permitting it to occupy a field of transportation already fully and satisfactorily occupied (so far as the interests of the general public were concerned) by the service of existing common carriers.

After the filing of this answer and on November 11, 1915, testimony was taken in the Circuit Court No. 2 of Baltimore City, and Richard D. Upham, vice-president of the United States Asphalt and Refining Company, called on behalf of the plaintiff in this case, testified "that the new owners will operate the road as an entirely independent company, and they will furnish such equipment and build such extensions as may be demanded; the tracks of the United States Asphalt and Refining Company have been built to the line of the Prudential Oil Company, and connected with the switch built into the property of that company; the Alcohol Company is building a large plant with which switching connection can be made by the Chesapeake and Curtis Bay Railroad; this is a *large industry and adjoins* the *property of the Asphalt Company* on the west; the new road will be a profitable enterprise and a real common carrier; the road will be amply financed and it stands ready to provide sufficient funds to purchase all cars and locomotives, car floats and other conveniences that may be necessary for the public at Wagner's Point." The witness files also a letter, dated October 13, 1915, from the German-American Car Company, stating that that company "will build a repair and construction shop" in that territory, if franchise is granted to Curtis Bay

Railroad, because it will afford additional and necessary railroad facilities.

*A. E. Beck*, a witness called by the applicant, testified "that he has examined the ground; has seen switching facilities made to open up the property of the Prudential Oil Company, and the Alcohol property to the Chesapeake and Curtis Bay Railroad Company and thus relieve a necessity and create a convenience for these two companies to have their output by all three of the trunk lines; the Chesapeake and Curtis Bay Railroad *will be a connecting line railway*."

*Theodore H. Ellis*, a witness called by the applicant, said: "The Chesapeake and Curtis Bay Railroad *has been actually extended into* the Prudential Oil Company's plant, an industry whose business is probably larger than the business of the United States Asphalt and Refining Company (folio 55); and survey has been made and plans prepared and estimates given for extension into the Alcohol plant; and connection can be made with the *Martin Wagner plant*, without interfering with or crossing the Baltimore and Ohio Railroad."

*W. Frank Crabtree*, a witness called by the applicant and representing the German-American Car Company, testified that *there is a necessity in the East* for a business location for his company, and if the franchise is granted, Wagner's Point is a very suitable place, but *without this connecting link railway* it would not be a suitable place; our nearest repair shop is Warren, Ohio, and we could send cars there for repair *with less cost and more expedition* than have them repaired by the Baltimore and Ohio Railroad at Mount Clare shops; there is a great delay in that service (folio 61); this new railroad, as a common carrier, would be *a convenience* to all the industries there, because it would give direct connection with all the railroads entering Baltimore; it would be of *unusual benefit* to my company, as it handles cars for the Alcohol Company, Royston Company, United States Asphalt and Refining Company, Inter-Ocean Oil Company and the Davidson Chemical Company, across Curtis Bay. On behalf of the protestant there appeared as witnesses:

William R. Askew, division freight agent B. & O.

Richard Brook, assistant division engineer, B. & O.

Ennis C. Johnson, yard master, Curtis Bay, B. & O.

William L. Campbell, assistant in third vice-president's office, B. & O.

And the testimony was then finally closed; and *thereafter* and on November 18, 1915, it *was ordered by the Circuit Court No. 2 of Baltimore City* that the newly submitted evidence be returned to the Public Service Commission, and that further proceedings be stayed for 15 days. And again thereafter and on December 21, 1915, the papers were returned by the Commission to the Court, accompanied by the *Second Opinion of the Commissioners.*

In this opinion the commission determines, that *from the additional testimony,* "*facts were developed* which make a change in the situation"; meaning directly "the *developments* which have taken place on the *land adjacent* to the territory intended to be served by the proposed railroad," and these developments, after being detailed in the opinion, lead the commission to the conclusion that they "*open a wider field* for the operations of the Chesapeake and Curtis Bay Railroad, which under the testimony originally before us, was limited to the three industries which have heretofore been operating it as a plant facility," and then the opinion continues:

"*But* if the proposed railroad is to extend its tracks, so as to reach the property of the corporations aforesaid, *as well as the lines of other industries that may be established in this neighborhood,* and is also to purchase cars, locomotives and other equipment that may be necessary to carry out the objects of its charter in a vigorous and successful manner, *it must be financed* more liberally than appears from the record. With the capital of $50,000, authorized by the charter, it could not respond to needs and requirements of the business established in that section *and about to be established there.* The capital would be almost exhausted in paying for the tracks already laid and the two locomotives mentioned in the evidence, leaving only a small sum for operating expenses and for extension of the trackage as proposed. It is estimated that the *project efficiently carried out would cost about* $200,000.

In deciding upon an application like the present, *"each case must depend upon its own circumstances."* "A railroad which claims to be a common carrier, immediately upon being placed in such a status, derives under the law certain privileges and advantages, and also incurs certain responsibilities and liabilities. Among these may be named the right to connect with the tracks of any other railroad already established as well as to ask for the establishment of joint rates for traffic with such other railroads. *The opinion continuing* enumerates the various requirements of common carriers under our State Law as follows:

"*Under Section* 13 of the Public Service Commission Law, a common carrier is required to furnish safe and adequate facilities for transportation of passengers, freight or property, or for any service rendered or to be rendered in connection therewith."

"*Under Section* 14 of said law such a railroad is obliged upon the application of any shipper tendering traffic for transportation, to construct, maintain and operate upon reasonable terms a switch connection or connections, with a lateral line of railroad or private track owned, operated or controlled by such shipper."

"*Under Section* 15 it is required to file its schedule of rates, fares and charges for the transportation of passengers and property within the state between each point upon its route and all other points thereon."

"*Under Section* 19 it is required to furnish suitable cars for the transportation of freight in carload lots and to have sufficient cars and motive power to meet all the requirements for the transportation of passengers and property that may be anticipated."

"*Under Section* 22 it shall be made to provide, under the order of the commission, safe and adequate equipment in the discharge of its public duties."

Commenting upon these requirements, and continuing its second opinion, the commission proceeds: "As AT PRESENT CAPITALIZED, we do not see how the Chesapeake and Curtis Bay Railroad Company *could respond* to any order of the commission to *compel it to comply* with the obligations which it would assume. *Our objections are two-fold:*

*One,* "relating to the sphere of operations, as limited by the charter"; and the *other,* "inadequate capital to finance the project."

The opinion then goes on to discuss the termini, and holds that (*a*) the Prudential Oil Company, (*b*) the Alcohol Company and (*c*) the German-American Car Company, lie beyond the limits of the termini in the original charter. And the opinion continues with the statement, *"if we should decide* to modify our previous opinion and order because of the service proposed to be extended to them (*a, b, c supra*), we could not authorize the exercise of the franchise *without an amendment to the charter* covering the territory in which such industries are located," and then the opinion concludes thus: ·

*"For the aforegoing reasons, as well as for the reasons set forth in our original opinion,* the commission is unwilling to alter, modify, amend or rescind its order of September 30, 1915."

To meet the additional and specific objections made in the second opinion of the commission, there was filed by the applicant on the 24th day of December, 1915, in the office of the Secretary of State of Maryland, an amendment to the charter of the proposed railroad setting forth the following additional termini for the construction and operation of said railroad, to wit: *"said road also* to run northerly and westerly from the car float now located on the property of the United States Asphalt and Refining Company at Curtis Bay, in a northerly and westerly direction to the so-called vinegar or alcohol plant now in course of erection at Stone House Cove; and in a northwesterly direction on the land of the United States Asphalt and Refining Company towards Fairfield; and in a northerly direction to the plant of the Prudential Oil Company, all being within Anne Arundel County in the State of Maryland"; and a certified copy thereof was duly filed in this case on December 29, 1915. And there was also filed by the applicant, on the 23rd day of December, 1915, in the office of the Comptroller of the Treasury of the State of Maryland, a certificate of increase of the capital stock of the Chesapeake and Curtis Bay Railroad Company to the sum of two hundred thousand dollars ($200,000), divided into four thousand (4,000) shares of the par value of fifty dollars ($50) each; and a certified copy thereof was duly filed in this case on December 29, 1915.

Without formal order and by agreement all the papers and testimony in the case (including the two certified copies above mentioned) *were again returned to the commission;* and on the 14th day of January, 1916, testimony was again taken before the commission on behalf of the Baltimore and Ohio Railroad (the attorney for the applicant declining to attend and subsequently filing, by leave of Court, objections to the taking of same) and argument was submitted on behalf of the protestant. The witnesses examined were John Edmund Schuler (who identified a blue-print filed in evidence and marked Protestant's Exhibit No. 1); Messrs. Brooke, Johnson and Askew (who testified concerning termini) and John J. Tatum (who testified "that when a break occurs in any appliance in a tank car, under the Federal Safety Appliance Act, the railroad *then* using it must have it repaired at the nearest repair point."

It seems proper, *at this point,* that this last testimony taken before the commission should be considered by the Court, and its reasons here set down for declaring that it is all inconclusive and entirely inapplicable in the settlement or illustration of the controversy now being considered. The witnesses called on to examine the new termini showed such insufficient knowledge of the territory as to lose all force in their evidence; some referred to them as vague and indefinite and not precise, and Mr. Askew, when handed the amended charter by one of the commissioners and asked to "designate with any approximation the termini of the proposed railroad," is reported in the record as having taken the amended charter and shown "the directions in which the Chesapeake and Curtis Bay Railroad Company will run" on the blue-print filed and marked Exhibit No. 1, *according to his interpretation.* The witness *Tatum,* in speaking of appliances, *means safety appliance,* and that it must go to the *now nearest repair shop,* Mount Clare, but Mr. Crabtree, who speaks for the German-American Car Company, means that his company will not depend on the testimony of this witness as to whether

it should or will locate in this district; he says they will locate if they can have the railroad service they need; he means that his company will erect in this district the "nearest repair shop." The testimony of the witness Johnson is referred to with approval in the third opinion of the commission, but this Court submits the following portion of that testimony, both as to question and answer, as its comment upon the whole; it is charming in its simplicity, but distinctly lacking in probative force.

Commissioner: Mr. Johnson, do you think the B. & O. with its present trackage and equipment up there is able to handle all the traffic in that district?

Witness: I do.

Commissioner: With convenience to the public?

Witness: I do.

Commissioner: You don't think this additional road that's applied for would help the situation?

Witness: I do not.

In the argument of Mr. Webber, counsel for the protestant, it is conceded that the capital stock has been increased, as suggested in the second opinion of the commission, and inasmuch as no further reference to that difficulty is made in the last opinion of the commission, there will be no further discussion of that feature, and the Court will conclude finally that *the proposed new railroad*, if the franchise is granted, *will be amply and adequately financed*. Mr. Webber continuing urges, with but slight insistence, the consideration of the general testimony last taken, but *does except*, as also does the commission in its last opinion, to the language of the amended charter, *fixing additional termini*, as being vague and indefinite; that the language is not precise and that it is doubtful whether the certificate gratifies the requirement of the Statute. At this point it seems appropriate and convenient to announce the law, in this state, relating to the *subject of "Termini*," so that another feature of the controversy may be finally determined, notwithstanding that this objection was waived and abandoned by counsel for the commission at the hearing before this Court. *This is the law*, in requiring that the termini shall be specified, by any proposed railroad or railway, in its act of incorporation, it would seem that the only reasonable intent to be imputed to the law is that the railroad shall have such termini definitely ascertained and fixed so as to *indicate its general direction* and *location*."

Union Railroad Co. vs. Canton Railroad Co., 105 Md. 12.

Hyattsville vs. W. W. and G. R. R. Co., 122 Md. 660.

Counsel proceeding in his argument urged to the Commission that "here is an important terminal of the Baltimore and Ohio"—and the exercise of the franchise by the new company must mean the use, to some extent, of that terminal. This is to some extent true; —no railroad should be compelled to give up its terminals to another carrier. But it is not an abstract proposition— there are limitations—and that fact cannot be considered unless it appears in addition that, the Baltimore and Ohio, the owner of said terminals, *in the use of its said terminals*.

(a) Gives adequate service to the general public involved; and

(b) That there is no demand for through or joint rates; that there are no unjust or unreasonable rates, or unjust or unreasonable practices or discriminations.

If there be none of these objections, then there is force in the opinion in the New York Dry Dock case—cited in the argument—otherwise there is none. However this question of adequate service and public demand is of the very "warp and woof" of this enquiry:—and depends upon the situation developed, under the testimony in this enquiry—and is the final text adopted by Mr. Webber in his argument when he states at the outset thereof that this controversy is "*only* a question of whether there is any necessity or any reasonable necessity for this road at Curtis Bay."

Counsel concluding his argument suggests the following rules to determine the final action of the local Commission.

(a) Is exercise of franchise asked for likely to be for the public good.

(b) The Baltimore and Ohio has built up the territory at Curtis Bay, and it has a claim on that territory because of the money invested; the at-

tempt to satisfy the public, and because there is no evidence to show that there is a general demand, in fact any demand by the public for different or increased facilities.

(c) And that necessity has been held to be reasonably necessary; and the Interstate Commerce Commission has uniformly defined that term, or the words, reasonably necessary as reasonably satisfactory.

Following this testimony and argument the Commission on the 18th of January, 1916, again, with an adverse opinion, returned all the papers to the Court.

### THIRD OPINION.

It appears from this opinion that the Commission held that the last testimony showed that the "Baltimore and Ohio had *recently* spent large sums of money in extending its tracks and establishing freight yards and *was able at the present time* to serve all plants, in the vicinity, conveniently and efficiently" etc.; and that the charges known as premium rates had been *entirely abolished.* This last opinion concludes as follows: "In our original opinion we expressed the view that the proposed road, *under the facts as then presented* was not demanded by public convenience or public necessity. The development of facts, as shown in the record, *in the subsequent presentations of the case* does not weaken the position *then taken by us*, that the ultimate welfare of the public in this particular section of the Curtis Bay District will be helped and not hindered by our refusal to grant the application of the petitioner."

On January 24th, 1916, the matter was fully and finally argued before the Circuit Court No. 2 of Baltimore City —and the argument being concluded was submitted for decision.

Upon this submission for the final decision of this Court it is apparent, from the record, that the repeated adverse orders of the Commission—rested *upon only two definite objections* to the granting of the petition of the applicant. They are, as stated by the Commission, to be found in its first opinion, as follows:

(a) That the petitioner has no existence or standing as a common carrier.

(b) That the petitioner has failed to make out any case of public conveni-

ence or necessity that would warrant the commission in permitting it to occupy a field of transportation already fully and satisfactorily occupied, so far as the interests of the general public are concerned, by the service of existing common carriers.

It is true that other objections were made in the following opinions of the Commission—but the testimony in the record and as abstracted in this finding, demonstrates that these other objections were met and fully answered. It should be stated, in this finding, that it has not escaped the attention of the Court that in its examination of the several orders of the Commission—there is to be found widely varying verbiage, e. g.;

in the *first finding* there is a *definite pronouncement* as set out above under *sections a.* and *b.; in the second finding* are these statements, "facts were developed—making a change in the situation; development have taken place on land adjacent; these developments open a wider field; it must be financed more liberally; the project efficiently carried out would cost $200,-000; *each case must depend upon its own circumstances;* as at present capitalized; *if we should decide to modify;* we could not authorize * * * *without an amendment to the* Charter"—and then again the definite pronouncement as above *a.* and *b.,* are added as reasons;—*in the third finding* are the words, "Baltimore and Ohio had *recently* spent large sums of money in extending its tracks and establishing freight yards and *was able at the present time* to give convenient and efficient service; premium rates *entirely abolished* (when, as testified to by Mr. Askew, the witness of the protestant most thoroughly informed on the subject, this is not a fact.)

These cullings are not herein set down in any spirit of animadversion, for the Court is mindful of the fact that under the law the finding of the Commission, *if based on substantial evidence,* are conclusive; and of the further fact that the personnel of the Commission means care, patience and intelligent consideration; but they must be considered, because under the provisions of the local statute—the only province of the Court, in this case, is to determine whether the action of the Commission, under the provisions of Section 43, of that law, is *reasonable*

or *unreasonable*, there being in the case no question of "rates, tolls, charges or schedules" concerning which the findings as being *lawful* or *unlawful* is matter of consideration. And so the Court sets them down, in contrast, for the purposes of its investigation.

The *objection*

(a) As above set out, "that the petitioner has no existence or standing as a common carrier," after examination of the law and the evidence will not receive the approval of this Court. In Volume 6, at folio 207, of the American and English Encyclopedia of Law, we find this general definition: "A common carrier is one who undertakes for hire or reward to transport from place to place the goods of those who choose to employ him," and the text book definition is this:

"When a road, however short it may be, is actually operated independently with its own locomotives and cars, it would seem to be an independent carrier, though it is operated for the exclusive benefit of the industrial enterprise which uses it; provided it would accept such general traffic along its line as might be offered to it."

Wyman, Public Service Corporations. Sec. 177.

The objection urged against the proposed corporation being granted the franchise, as appears from the testimony, was directed to the fact of its extremely limited trackage; its manifest lack of even scant equipment; the absence of stations and public along the proposed line of its operation; the purchase by it of a plant facility—and the selection of those originally interested in that facility as officers of the new corporation; and that only the products of a particular plant and its allied industries could find outlet through its service. And in addition—another reason is stated in the special finding of W. Bruce Duer, the transportation expert of the Commission—in these words:—"*In the past* it was not unusual where an industry had plant tracks, without any common carrier characteristics, to incorporate as a railroad—for the purpose of getting a division of the rates, remission of charges for detention of cars etc. while only performing the same service which the industry had previously performed without compensation. Therefore these shippers on account of their incorpo-

rated railway were allowed advantages over other shippers. In other words, it would result in *favoritism* and *unfair advantage* to particular shippers and at the same time is quite a hardship on the trunk lines or *legitimate railroads* as well as the public." This witness is a recognized expert—and the above graphically delineated situation, when demonstrated to be a fact, deserves the full force of his animadversions, but his conclusion that "*this apparently* is the purpose of the applicant in this case"—is gratuitous, unfair and absolutely unsupported by any testimony in the case—and is an attack upon the integrity, high-standing and bona fides, as shown in the testimony, of all those connected with the proposed new railroad that is entirely unwarranted. And the same unfair and gratuitous expression of opinion is lamentably to be found in this first finding of the Commission, "the *manifest* purpose of the applicant seems to be to have its charter granted and *by means thereof* to force a division of rates—*and sap the vitality of other* responsible carriers." This is a large and momentous question;—its solution must be had within the law and the evidence in the case; the question must be lifted above crimination and recrimination;—there is no place in it for either the charge of "monopoly" as directed against the protestant—or the suggestion that "favoritism" is being sought in the action of the applicant. But now to return to the question of the common carrier, with this citation.

"The uses for which the track was desired are not the less public because the motive which dictated its location over this particular road was to reach a private industry, or because the proprietors of that industry contributed in any way to the cost."

Hariston vs. Danville & W. R. Co. 208 U. S. 608—and to announce the conclusion of this Court in the language of

The Tap-line case, 234 U. S. 23, "the extent to which a railroad is in fact used does not determine the fact whether it is or is not a common carrier. It is the right of the public to use the road's facilities, and to demand services of it, rather than the extent of its business, which is the real criterion determinative of its character."

The remaining objection against the grant of the franchise is the failure on

part of applicant to make out a case of *public necessity* or *convenience*. This is a question of fact to be determined from the evidence—and because the answer rested in the evidence—is the reason why this finding and opinion has been prolonged to its great length —for the testimony had to be carefully, and in detail examined and abstracted —to fix its probative value in the mind of the Court:—and to meet the requirements of Section 46 of the Public Service Law of Maryland which imposes, in this case, upon the applicant the burden of showing "by clear and satisfactory evidence" that the orders of the Commission complained of herein are *unreasonable*. This does not mean independent testimony to be taken after the findings of the Commission—but refers to the testimony already in the record of the case. In the examination of this last objection the evidence must not satisfy two requirements. These prerequisites are disjunctive. The applicant must show *either public necessity* or *public convenience;* he need not demonstrate both—but he must show one—and in the case in this Court that must be done by "clear and satisfactory evidence." Section 46. This, in the opinion of the Court, the applicant has done—as to both of the requirements. An examination of the testimony heretofore set out in this finding and opinion shows an admitted lack of service—in this territory for many years before the application in this case was filed. It shows that the industries already established there, without considering those in process of construction—create in themselves the necessity and convenience contemplated by the law. It shows that the original plant facilities have grown with the wonderful development of the neighborhood—in trackage and connections, and in unison with the increased business of the pioneer companies. It shows that complaints as to service from the common carrier in the territory were constant—and response to those complaints spasmodic and long delayed. It shows that large industries and enterprises—are anxious to avail themselves of the conveniences of outlet to all the trunk lines of railroad entering the City—by means of this connecting link road. It shows that because of repressed and shut in conditions the moving of manufactured products and raw material, by the land side out of and into the industries, was subject to the dispositions of a single carrier—who, until recently, gave no adequate attention to the situation and neglected the same, and subjected the shippers to unnecessary delays in transportation. It shows that excessive rates were charged the shippers in that territory—until after the filing of the application, since which time certain limited, but not complete relief, has reached the shippers. It shows certain activities of the protestant, the Baltimore and Ohio Railroad Company, since the filing of the application, i. e., premium rate reductions; additional storage yards and increased trackage facilities. It is urged in opposition to this proof of inadequate service and public inconvenience that, under the powers of the Maryland law, the Commission on complaint can correct all the abuses, if and when existing, complained of as affecting the shippers in the Curtis Bay district, and that there is no necessity for the creation of a new carrier, and no convenience of the public can be satisfied by that proceeding.

It is undoubtedly true that under the provisions of Sections 13, 23, 28 of the State Law, powers are given to the Commission of a very broad character as to rates and proper equipment and service, on complaint and after independent investigation. But no permanent relief will follow this whipping-in process, when the old story of lack of convenience, neglect and inattention is read in the record in this case, and there is force in the testimony given that properly controlled competition is more distinctively effective in improving public convenience and ministering to public necessity than appeals to the power of the Commission. If the application is reasonably within the law as to convenience or necessity; if it has merit, it should be granted; if there are indications that it may desire charter life to be in the position of forcing existing lines to buy it out, or it lacks financial backing for its construction or operation, then it should be denied. But in fairness and under the law these matters should assume the conclusive force of proven facts. "Whether the ownership is private, or that of great companies or enterprises, is not material. Why would manufacturers seek to invest their money in these belt line roads

if the service already at hand is adequate?" The Court in conclusion holds that it appears by clear, satisfactory and conclusive evidence that the orders and each of them of the Public Service Commission of Maryland set out in the proceedings herein, and refusing the petition of the applicant herein are unreasonable and should be set aside and vacated and the prayer of the petition granted, and an order will be signed accordingly, with costs to the plaintiff.